```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY

GROSS-QUATRONE,                    .
                                   .
        Plaintiff,                 .
                                   .  Case No. 17-cv-13111
vs.                                .
                                   .  Newark, New Jersey
MIZDOL, et al.,                    .  January 21, 2022
                                   .
        Defendants.                .
                                   .
```

                       TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE LEDA DUNN WETTRE
                  UNITED STATES MAGISTRATE JUDGE


APPEARANCES (the parties appeared via Zoom videoconference):


 For the Plaintiff:      ANDREW W. DWYER, ESQ.
                         The Dwyer Law Firm, L.L.C.
                         550 Broad Street, Suite 704
                         Newark, NJ 07102
                         (973) 242-3636
                         andy@thedwyerlawfirm.com


 For the Defendants:     KATHLEEN ELIZABETH DOHN, ESQ.
                         Brown & Connery LLP
                         360 Haddon Avenue
                         Westmont, NJ 08108
                         (856) 854-8900
                         kdohn@brownconnery.com



Audio Operator:

Transcription Service:     KING TRANSCRIPTION SERVICES
                           3 South Corporate Drive, Suite 203
                           Riverdale, NJ  07457
                           (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

1                    (Commencement of proceedings)

2

3          THE COURT:  Good morning.  We're on the record in

4  Deborah Gross-Quatrone versus Bonnie Mizdol, et al., Civil

5  Action Number 17-13111.  I'm Magistrate Judge Wettre here to

6  hear oral argument that was noticed on defendants' motion to

7  compel an independent medical examination of the plaintiff.

8          So may I have appearances, please, starting with

9  plaintiff's counsel.

10          MR. DWYER:  Good morning, Your Honor.  Andrew Dwyer

11  of the Dwyer Law Firm, appearing for the plaintiffs.

12          THE COURT:  Good morning.

13          MS. DOHN:  Good morning, Your Honor.  Kathleen Dohn

14  from the law firm of Brown & Connery on behalf of the

15  defendants.

16          THE COURT:  Good morning.

17          So it's defendants' motion, and so I'll hear you

18  first, Ms. Dohn.

19          MS. DOHN:  Thanks.

20          Your Honor, I know that you've been through all the

21  moving papers and all the exhibits.  So what I don't intend

22  to do today is to go through chapter and verse.

23          So what I would like to focus on is the inquiry

24  that Your Honor had raised as to whether or not this motion

25  is now rendered moot by the representations that were made by

1   Mr. Dwyer.

2           And respectfully, Your Honor, I don't believe it

3   has.  And the reason why is that if you look at the string of

4   cases that were cited by both parties --

5           THE COURT:  Can I stop you for a second, Ms. Dohn.

6           MS. DOHN:  Sure.

7           THE COURT:  Just to tell you where I am on that, I

8   just wasn't clear if the parties had reached an accord.

9   That's why we issued that order.

10          I accept that they haven't.  And so if the parties

11  stipulate to something that obviates the motion, that's

12  completely up to them.  I am not going to do that by

13  representations that were made in briefs.  It would have to

14  be presented to me as a stip- -- a binding stipulation.

15          So I'm in the land of Rule 35 and the Third

16  Circuit's instruction on it.  So you don't really have to

17  defend as -- you know, whether you've reached some kind of

18  informal accord.  I'm assuming that you haven't.

19          But go ahead.

20          MS. DOHN:  -- absolutely.

21          But I think it's instructive, because I think where

22  we are right now is why should there be an IME compelled if

23  the plaintiff is saying that I am no longer -- I am not going

24  to testify that there's ongoing distress, and I don't intend

25  to call a physician as an expert.  So that's where it's kind

1   of the lay of the land that we have now.

2            And I'll say that the -- the representation that

3   she's not going to claim any ongoing distress is

4   contradictory to her deposition testimony.  And I think if

5   Your Honor looks through -- and I know you have -- has

6   reviewed --

7            THE COURT:  Can I ask you something too, just to

8   clarify that?  Even taking at face value that she's not

9   claiming any ongoing distress, there's been a couple of years

10  since the conduct complained of in the complaint.  So there's

11  a good chunk of time for which she could still claim

12  emotional distress, to my understanding.

13           MS. DOHN:  Right.  And I think the problem that we

14  have right now is there's a lack of clarity as to that,

15  because the deposition testimony has, to a certain extent,

16  been walked back.

17           Reviewing all the cases that are cited Your Honor

18  in which they -- where IMEs have been either granted or

19  denied, I think the common thread among them is in the cases

20  where an IME or request for an IME has been denied is there

21  have been clear parameters as to what the testimony is going

22  to be.

23           And in reviewing those cases, it was a plaintiff

24  that was not alleging severe emotional or physical harm

25  requiring psychiatric care.  They did not seek to support

1   their claims with testimony or records of psychiatric or

2   medical personnel.  Counsel for plaintiff expressly

3   represented they would not introduce evidence that

4   defendants' conduct caused or exasperated [sic] -- condition,

5   and there were no allegations of ongoing emotional distress.

6           And that's simply not the case that we have here.

7   We have a plaintiff who had testified that the emotional

8   distress that she experienced at the hands of these

9   defendants, allegedly, was continuing to present and would

10  forever be with her.  We have answers to interrogatories in

11  which she specifically cites that she treated with 21 medical

12  providers, including a psychiatrist and a neuropsychologist

13  for emotional distress that she attributed to these specific

14  defendants.  One of those providers, Dr. Acquaviva has

15  diagnosed her with depression as well as anxiety.  And there

16  is no history of depression.

17          So a jury is left with the testimony that I can

18  only gather would be that I experienced all these alleged

19  discrimination at the hands of the defendants in this case.

20  I sought medical treatment by a psychiatrist, and he

21  diagnosed me with these.

22          That goes well beyond garden variety.  And her

23  testimony that it was ongoing goes well beyond garden variety

24  as well.

25          And there's a lack of clarity --

1          THE COURT:  Well, "garden variety" isn't used

2   either by the Rule 35 or the Third Circuit.  Their term is

3   "severe emotional distress."  So I don't know what "garden

4   variety" means.  It has no -- as far as I know, it has no

5   objective definition.  So it's not -- I know parties bandy it

6   about, but it's not very useful to me.

7          MS. DOHN:  Absolutely.

8          And I think -- but I think what the parameters is

9   that severe emotional distress is emotional distress for

10  which you seek medical treatment for, that you have medical

11  diagnoses for, and that goes beyond, I'm sad, I'm upset, I

12  felt bad about this.

13         And that's what we have here.  She's alleging that

14  there's exasperation [sic] of physical clinical conditions.

15  And I just want to touch upon a couple of the cases, because

16  I think -- I think are instructive.

17         First, I wanted to lead with Benham v. Rice because

18  I understand that that was a point of -- in opposition.  And

19  obviously the magistrate judge's ruling was overruled by the

20  district court in that analysis.

21         However, I think the judge's analysis by the

22  district court actually buttresses our claims here for an

23  IME, because in saying that an IME wasn't warranted in that

24  case, the district court said Benham does not seek damages

25  for severe emotional or physical harm requiring psychiatric

1   care in the past or present, and she does not seek to support

2   her claim with the testimony or records of any psychiatric or

3   medical personnel.

4          What a difference from what we have here.  What we

5   have here is a plaintiff who is going to testify as to her

6   emotional distress, that she sought treatment with

7   Dr. Acquaviva, and Dr. Acquaviva diagnosed her with these

8   specific diagnoses.  And it's unclear what the time

9   parameters are going to be, because we have medical records

10  as late as October of 2020 from her psychiatric care

11  professional, Dr. Acquaviva, that discuss Judge Mizdol, who's

12  a defendant in this matter.

13         So it's unclear to me what those time parameters

14  are going to be, since we're now walking back the deposition

15  testimony of the plaintiff.

16         Here, she pled in her amended complaint and her

17  answers to interrogatories, she testified at her deposition

18  about the severe emotional distress that manifested itself in

19  physical harm and exasperated clinical conditions.

20         And that, I think, is a key distinction.  I know

21  the plaintiff relies heavily upon Conforti.  And that's one

22  of the key distinctions that I think we have here that

23  differs from the plaintiff in Conforti.  But that plaintiff

24  expressly represented that he would not introduce evidence

25  that defendants kind of caused or exasperated any clinical

 1   conditions.

 2            We don't have any such representation that I'm

 3   aware of to the Court.  Mr. Dwyer will certainly, you know,

 4   apprise the Court if I'm incorrect in that regard.  But my

 5   understanding of the testimony and my understanding of

 6   everything that's been produced in discovery thus far is that

 7   any testimony should -- from a trial would be that she

 8   suffered such emotional distress that it exasperated clinical

 9   conditions such as her thyroid conditions, her Hashimoto.  It

10   was so severe that it required surgical intervention because

11   of the nose bleeds that she was suffering that she attributed

12   to the emotional distress caused by the defendants in this

13   matter.

14            It's hard for me to understand or comprehend --

15            THE COURT:  Are you saying that the -- if she

16   sought damages for physical conditions, it would necessarily

17   be physical conditions that were a physical manifestation of

18   emotional distress?

19            MS. DOHN:  Absolutely, yes.

20            THE COURT:  She's not alleging that, you know,

21   anyone -- any of the defendants physically directly harmed

22   her, pushed her or the like.

23            MS. DOHN:  Absolute- --

24            THE COURT:  So the physical would have to come --

25   the physical conditions for which she seeks damages would

 1  have to be manifestations of emotional distress.

 2          Is that the defendants' position?

 3          MS. DOHN:  That's exactly -- that's exactly it,

 4  Your Honor.  This isn't the case where she's alleging one of

 5  the defendants punched her in the nose, and as a result of

 6  that, she's required surgery.

 7          She's saying that I suffered such emotional

 8  distress that it manifested itself in these physical, you

 9  know -- in this physical representations, and that included

10  exasperating clinical conditions.  I think that's a -- I

11  think that's clear-cut severe emotional distress.  It's hard

12  for me to see otherwise.

13          And I think the case law bears that out.

14          THE COURT:  Okay.  Anything else?

15          MS. DOHN:  No, Your Honor, unless you have any

16  questions.

17          THE COURT:  Not so far.

18          Okay.

19          Mr. Dwyer, your turn.

20          MR. DWYER:  Thank you, Your Honor.

21          There are actually two issues under Rule 35, and

22  Ms. Dohn only touched on the first one, the "in controversy"

23  requirement.  The second requirement, which is a good cause

24  requirement, she didn't really mention that at all.  I'm

25  going to address both requirements, because both requirements

1  are lacking here, but if either one is lacking, the Rule 35

2  motion has to be denied.

3         Now, as far as the Third Circuit law goes, the

4  leading Third Circuit case, the District of New Jersey, is

5  the Bowen case.  We also cited Judge Waldor's case --

6  decision --

7         THE COURT:  Well, the Kuminka case was the Third

8  Circuit case.  Right?

9         MR. DWYER:  Yeah --

10         THE COURT:  Bowen was a district court, and it was

11  this district court.  So it would be a judge of like stature.

12  The binding precedent is the Third Circuit in Kuminka.

13  Right?

14         MR. DWYER:  And Bowen is consistent with that.

15         And defense counsel has not cited any case that

16  contradicts Bowen.  And they have not cited any case that

17  contradicts Judge Waldor's decision in the Conforti case.

18  And as we pointed out in our surreply that Your Honor

19  permitted us to file, when they attempted to cite cases not

20  from this jurisdiction, it turned out to -- cases weren't

21  good law.  She cited cases overturned, it was reversed by the

22  district court judge.  And she cited another case that has

23  been expressly disavowed in the District of Columbia

24  district.

25         So the defense has failed to cite any cases that

1    distinguishes <u>Conforti</u> or <u>Bowen</u> or any of the other cases

2    that we cited.

3            Now with regard to the "in controversy"

4    requirement, Ms. Dohn keeps emphasizing this idea of ongoing.

5    That's not what the case law says.  And in fact, <u>Conforti</u>

6    addressed that issue head on and rejected what Ms. Dohn is

7    saying.  Conforti explicitly said that even when there is

8    ongoing -- and I'm quoting here -- ongoing mental distress,

9    that does not expose the plaintiff to a Rule 35 exam unless

10   it is specific psychiatric condition or unusually severe.

11   I'm quoting here, Judge.  Quoting --

12           THE COURT:  Can I ask you a question on that that

13   relates to -- I mean, it's a very fact-sensitive analysis,

14   and I have a lot facts before me in this case.

15           So on the point -- interpretation of what it means

16   to be -- 35, one of the criteria that can satisfy in

17   controversy is that the plaintiff is making an allegation of

18   a specific mental or psychiatric injury or disorder.

19           Now, Ms. Dohn provided Dr. Acquaviva, her treating

20   psychiatrist records in which he does make a specific

21   diagnosis.

22           So why wouldn't that be enough to demonstrate her

23   condition is in controversy?

24           MR. DWYER:  So, Your Honor, you broke up quite a

25   bit on that question.

1             THE COURT:  Oh, I'm sorry.

2             MR. DWYER:  I couldn't quite catch everything, but

3  I think I've got the gist of it, so I'll do my best --

4       (Simultaneous conversation)

5             THE COURT:  Let me repeat it for you.  Okay?

6             And tell me -- just raise your hand if I start

7  breaking up.  I apologize.  The Internet is not always great

8  from here.

9             So what I said was Rule 35 just provides that a

10 condition has to be in controversy and some other criteria

11 about the -- you know, specifying the conditions of the

12 examination.

13            And then the Kuminka case by the Third Circuit

14 gives five criteria, any one of which may be met to show that

15 a condition's in controversy.

16            So one of them that the State is claim -- or not

17 the State, but the defendants are claiming here is that the

18 plaintiff is making an allegation of a specific mental or

19 psychiatric injury or disorder.

20            And I did review her treating psychiatrist,

21 Dr. Acquaviva's records, and he, as I understand it, will be

22 a trial witness.  And he gives a diagnosis of major

23 depressive disorder and generalized anxiety, which seems to

24 me to constitute an allegation of a specific mental or

25 psychiatric injury or disorder.

1           And so why is that criterion of being in

2   controversy not met on this record?

3           MR. DWYER:  Sure.  Thank you, Judge.

4           I think I understood the gist of what you're

5   asking.  And so the point of departure, I think, here for me

6   is that I don't agree that there has to be a stipulation in

7   between the parties to shape the relevant motion record.

8   That, in fact, what the case law that we cited says is that a

9   party, regardless what it says in its pleading or anywhere

10  else, can state that it's not seeking damages and will not

11  seek damages at trial for a specific psychiatric condition.

12          And we have stated that very clearly.  We will not

13  be seeking damages at trial for a specific psychiatric

14  condition.  We will not --

15      (Simultaneous conversation)

16          THE COURT:  But will you -- when I've seen this --

17  and I know you're a very experienced attorney, given the

18  busyness of our district.  I've had hundreds, if not

19  thousands, of employment cases where the plaintiff is seeking

20  damages for emotional distress.  And the many instances in

21  which this has come up, this very situation about the

22  plaintiff saying, "Well, gee, it doesn't qualify for an IME

23  to be taken.  It's garden variety and so forth."  When

24  there's a question, the way I've seen counsel answer that

25  question and obviate an IME is to say the plaintiff will not

 1    be seeking damages for emotional distress or physical

 2    manifestation thereof.

 3             I have not seen that in the briefs.  So if -- and

 4    also, I am not going to say that parties are bound by what

 5    they put in the briefs.  I don't know what's going to happen

 6    at trial.  At trial, the parties may say, "Well, that was our

 7    position then.  We --  it wasn't accepted.  It went off the

 8    table.  It never became part of our agreement at trial."

 9             So I'll leave it to -- I'll leave it to counsel.  I

10    am not going to go on any informal offers in papers.  If you

11    all want to stipulate to obviate the need to take an IME, you

12    know how to do it.  I've seen it done countless times before.

13    But short of that, I don't know what to do with the

14    representations about what might or might not be argued at

15    trial.

16             MR. DWYER:  So can I respond to what Your Honor --

17             THE COURT:  Yes, please.

18             MR. DWYER:  Okay.  Thank you.

19             So first of all, I don't think that's consistent

20    with the case law.  The case law does not require a

21    stipulation.  The courts recognize that the plaintiff is the

22    master of her own claims, and the plaintiff can simply state,

23    "We're not asserting that claim.  And we're not asserting

24    damages for a specific psychiatric condition."

25             I'd also respectfully disagree with your Your Honor

1   that there is any case law that says that if the plaintiff

2   claims any physical manifestations at all, that requires an

3   IME.  I don't believe there's any legal authority for that

4   whatsoever.

5            THE COURT:  I didn't -- but I didn't intend to say

6   that if you interpreted that.

7            MR. DWYER:  Okay.

8            Well, but -- so when Your Honor says, since there's

9   physical manifestations alleged here, that does not equal an

10  IME.  So what the case law says is you either have a specific

11  psychiatric condition, which we're disavowing, or unusually

12  severe emotional distress.

13           And what I was zeroing in on with the ongoing point

14  is that it's simply not true that because the emotional

15  distress is ongoing, that that automatically makes it ripe

16  for an IME.  That was specifically rejected by the court in

17  the Conforti case and in other cases that we've cited, and

18  Ms. Dohn doesn't cite any case law to the contrary.  The

19  Third Circuit has never said such a thing.

20           So, you know, Ms. Dohn says, "Well, the plaintiff

21  in Conforti and in Bowen said that they would never present

22  any testimony about psychological counseling."  That's not

23  true.  That's absolutely false.

24           The plaintiff in Conforti clearly was going to

25  present evidence of having sought psychological counseling

1   and also of having obtained medication, and, yet, Judge

2   Waldor found that was not a sufficient ground to place the

3   plaintiff's mental condition in controversy to warrant an

4   IME.

5           It's also not true, as Ms. Dohn kept suggesting to

6   Your Honor over and over and over again, that any allegation

7   that the defendants' actions exacerbated the plaintiff's

8   emotional distress leads to an IME.  The plaintiff in

9   Conforti -- the plaintiff's treatment provider in Conforti

10  was a fact witness -- was offered as a fact witness,

11  specifically testified -- and it's even quoted in the

12  Conforti decision that the defendants' conduct exacerbated

13  the emotional distress of the plaintiff.  But that didn't

14  warrant an IME.  That didn't put the mental condition at

15  issue because the plaintiff still wasn't alleging or seeking

16  damages for any kind of specific psychiatric conditions.

17          And if I may, on just one point on that, Judge,

18  which is that there is a difference in the way certain terms

19  are used.  And that's why we quoted at length from the

20  plaintiff's deposition -- and we provided it to you as well

21  so you could see it for yourself.  It's one thing for

22  somebody to say, you know, this makes me very anxious and

23  another thing for somebody to say you suffer from an anxiety

24  disorder.  We're not seeking any damages whatsoever in this

25  case, based on any kind of allegation that the defendants

1    have caused the plaintiff to suffer an anxiety disorder.

2              When plaintiff was asked about --

3              THE COURT:  Mr. Dwyer, let me just -- I wanted to

4    clarify something.

5              So Dr. Acquaviva is going to testify at trial, as

6    things stand now.  Dr. Acquaviva's speciality, as I

7    understand it, is psychiatry.  And he's treated the

8    plaintiff.  So if he takes the stand, it's not because he has

9    personal knowledge of what occurred in the workplace.  He's

10   obviously testifying based upon his treatment of the

11   plaintiff and what he's gleaned of her psychiatric condition

12   as it relates to her employment.

13             So whether you say you're seeking damages for a

14   specific injury or not, the jury may award compensatory

15   damages, and we all know that a jury has a rather free hand

16   on setting how much to award in compensatory damages.

17             Couldn't they rely on Dr. Acquaviva's testimony to

18   conclude that she suffered, in their eyes, severe emotional

19   distress and to award her damages accordingly?

20             MR. DWYER:  Yeah, they could award damages based on

21   Dr. Acquaviva's testimony, just like in Bowen, Judge.  In

22   Bowen, the plaintiff sought psychiatric counseling and

23   medication, and the doctor's testimony was presented to the

24   Court.  I'll read it to you.  [As read] This increase in

25   stress from plaintiff's employment, it caused an exacerbation

1    of Mr. Bowen's symptoms of depression, i.e., concentration,

2    insomnia, and helplessness.  Due to his symptom exacerbation,

3    Mr. Bowen's medication regimen was adjusted, and I

4    recommended that he not go to work at the job with the

5    Parking Authority beginning July 10, 2000, for an unspecified

6    period of time.

7              Despite that, this court held no ground for an IME.

8    The condition of showing that the plaintiff's mental

9    health -- or mental condition was in controversy was not met.

10             And, again, the courts have over and over again

11   said, claiming emotional distress, even severe emotional

12   distress is not enough.  You have to allege something that's

13   unusually severe, or you have to allege a specific

14   psychiatric condition.  And as the courts have pointed out,

15   if you don't follow that rule, then you're going to get a

16   Rule 35 exam in basically every case where anybody alleges

17   emotional distress damages.

18             And that's what courts have clearly indicated is

19   not the correct result.

20             So, you know, I don't know what to tell you, Judge.

21   The case law over and over again denies IMEs, notwithstanding

22   the fact that the plaintiff sought psychiatric counseling and

23   presented testimony from a treating physician as to that.

24             But, again, our representation to the Court -- and

25   we don't care if it's embodied in Your Honor's order -- is

1   that we are not going to seek damages based on any

2   psychiatric condition whatsoever.  We are also stipulating we

3   are not offering Dr. Acquaviva as expert testimony.  He's

4   simply a treating physician.

5            Now, as I said, I don't want to play hide the

6   ball --

7            THE COURT:  What's his reveal- -- what's his -- to

8   what relevant subject is he going to testify at the trial

9   about?

10           MR. DWYER:  You blanked out a little bit.  Did you

11  say --

12           THE COURT:  Yeah, what relevant -- what subject

13  that's relevant to the case is Dr. Acquaviva going to testify

14  to at trial?

15           MR. DWYER:  Sure.  About the plaintiff's emotional

16  suffering and what she can be provided for that.

17           The plaintiff is allowed to allege that she

18  suffering emotional distress.

19           THE COURT:  Right.

20           MR. DWYER:  She doesn't have to say that she got

21  treatment for it.  None of that warrants an IME.  There's no

22  case law that says that.  Not the Third Circuit.  Not the

23  District of New Jersey.  Nowhere.

24           That's the case.

25           THE COURT:  Mr. Dwyer, one thing I want to

1  understand further.  Is the plaintiff seeking -- will she be

2  seeking damages for physical injury?

3           MR. DWYER:  Yeah, for physical manifestations of

4  the emotional distress.  No different than if somebody said

5  because I was upset about what happened to me, I was

6  experiencing chest pains or I was having nightmares or I was

7  having difficulty breathing or I was having difficulty

8  sleeping.  All those things are in the case law about

9  insomnia, about, you know, physically upset about things.

10 All that's in the case law.  None of that entitled anybody to

11 a Rule 35 exam.

12           I would like to address the second point, which, as

13 I mentioned, Ms. Dohn didn't really address, which is the

14 good cause requirement.  Because there's a requirement, even

15 if the plaintiff's mental condition is in controversy -- and

16 I don't submit that it is.  But even if it is, the defendant,

17 not us, the defendant bears the burden of showing good cause.

18 The party seeking the Rule 35 exam has the burden of showing

19 good cause.

20           And as Conforti pointed out, even if the

21 plaintiff's mental condition was in controversy in that case,

22 there were in other tools available to the defendants to

23 explore the plaintiff's allegations of emotional distress:

24 The deposition of the plaintiff, the access to the

25 plaintiff's medical records, depositions of plaintiff's

1    treatment providers.

2          All that has been available to the defendants in

3    this case.  The defendants deposed plaintiff on her emotional

4    distress.  They didn't do so very extensively, frankly, but

5    that's not because of anything I did.  I didn't prevent her

6    from asking her those questions.  And we went over the

7    seven-hour limit, and I didn't stop the deposition until

8    Ms. Dohn said she was done asking questions.  She -- asked

9    every question she wanted to ask.  They've had access to

10   thousands of pages of my client's medical records.  They

11   haven't been refused anything from us.  Nothing.  Everything

12   in the world that they've asked for, however remotely related

13   to my client's medical condition, they have those records.

14          And they have known about my client's treatment

15   providers -- quite frankly, they've known about my client's

16   treatment providers even before this case was reactivated in

17   2020, because, remember, she made an application for

18   disability pension in 2019 that includes 600 pages of medical

19   records from various treatment providers.  They had all those

20   people -- they knew about all those people from the time this

21   case was reactivated in August 2020.  And they have never

22   lifted a finger to depose a single one of those treatment

23   providers.

24          That is not -- other options to gain this

25   information.

1          And by the way, if they want to depose one of those

2    people now, notwithstanding the fact that fact discovery

3    closed in November, I don't object to that.  I don't care.  I

4    am not trying to prevent them from getting access to

5    information.  But they don't have good cause in this case,

6    because there's no question about it that they have other

7    means that they have not even explored in terms of getting

8    discovery about my client's emotional distress damages.

9          And then the -- you know, as I pointed out, case

10   law says that when somebody's already had an IME, you have to

11   show that their condition's changed.  She had an IME just two

12   years ago with their expert.  Their expert --

13          THE COURT:  Their expert in another matter.

14          MR. DWYER:  Still their expert.  And actually they

15   testified in this case, Your Honor -- they submitted sworn

16   declaration by Craig Bailey that from day one, Dr. Ghilain

17   was going to be their expert.  And, actually, they never

18   disavowed using her as an expert either.  But they have that

19   IME, and they never presented --

20          THE COURT:  I don't know what the topic was of that

21   IME.  It was in a complete different proceeding.

22          MR. DWYER:  No, it's -- the topic included her

23   emotional distress damages, absolutely.  Dr. Ghilain

24   subjected the client to the Minnesota Multiphasic Personality

25   Inventory exam and opined about my client's emotional

 1   distress damages and basically offered the opinion that she

 2   didn't believe my client really was suffering from any

 3   emotional distress or that she was exaggerating the symptoms

 4   of emotional distress, which is fine.  You know, that's fine.

 5          But she subjected to her an IME two years ago, and

 6   the defendants have offered no evidence that there's been any

 7   change in my client's condition since two years.  So, again,

 8   that undermines the argument for good cause.

 9          But, I mean, most basically, why don't they just

10   take the depositions of her treatment providers?  Why can't

11   they get the information that way?  They can.  They're just

12   refusing to do so.

13          I don't think --

14          THE COURT:  Can I ask you something, something

15   further -- and I also meant to ask Ms. Dohn.

16          So assuming that an IME is ordered, Rule 35, as you

17   point out, does require the order -- to submit to a defense

18   exam to "specify the time, place, manner, conditions and

19   scope of the exam as well as the person or persons who will

20   perform it."

21          So we know who the person is who is proposed to

22   perform the exam.  And I'm assuming, based on what I saw in

23   the papers, the parties will be able to agree on a mutually

24   convenient time and place.

25          So what is it that -- the plaintiff would like

1    further specification -- specificity with regards to the

2    manner, conditions, and scope of the exam, if it takes place.

3            MR. DWYER:  Sure, Judge.  The cases that we cited

4    on page 29 of our initial brief, the -- I'm probably

5    mispronouncing it, but the Ornelas v. Southern Tire case and

6    the Usher case and the Nicholas case all take the position

7    that if there's going to be such an exam, under

8    Rule 35(a)(2)(B), part of the requirement is specifying what

9    tests are going to be administered.  And so I agree with

10   Your Honor that many of the procedural objections that we

11   raised about sort of the unlimited scope of the exam and so

12   forth and so on have been addressed by Ms. Dohn.  She's

13   agreed to hold the exam at a much more convenient and closer

14   location for the plaintiff.  She's agreed to have the exam

15   recorded.  She's agreed to have a nurse observer present.

16   And she's agreed to limit the exam to approximately two

17   hours.

18           We still would be entitled to know what tests are

19   going to be administered.

20           THE COURT:  Okay.  So then that's --

21           MR. DWYER:  -- that.

22           MS. DOHN:  And, Your Honor, I am happy to speak to

23   that.  And --

24           THE COURT:  Yeah, I was just going to ask you.

25           MS. DOHN:  Yeah, absolutely.  Thought it was

 1  addressed, but maybe it wasn't.  So Dr. Weiss is a

 2  psychiatrist.  And so the examination will consist of a

 3  clinical interview.  It's a typical mental status exam where

 4  you go over the developmental history, psychiatric history,

 5  family history, work history, and then to assess -- injuries

 6  plaintiff alleged emotional distress and explore any other

 7  causes of that emotional distress.  He's not a psychologist,

 8  so there won't be tests that are being administered in the

 9  fashion that any kind of neuropsychologist or psychologist

10  would do.

11          MR. DWYER:  The only clarify -- obviously, Judge,

12  I'm still very strongly opposing this exam, but the only

13  clarification I want to seek from what Ms. Dohn just said is

14  she said something about a mental status exam.

15          MS. DOHN:  It's a -- sorry.  Go ahead.

16          THE COURT:  One at a time for the record.

17          MR. DWYER:  Yeah, and so I am not exactly sure what

18  that means.  I will share with the Court that I was subjected

19  to a cognitive exam by my neurologist just a couple of weeks

20  ago.  I didn't do too well.  You know, that is a specific

21  kind of test, you know, where they make you say -- I think

22  it's President Trump said, "woman, man, person, camera, TV."

23          So if that's a test that's being administered,

24  we're entitled to know that.  If Ms. Dohn is just saying "No,

25  no, no, no cognitive or anything like that.  He's just going

1  to be asking her questions about her mental health and so

2  forth and so on," then that's clarifying.

3           THE COURT:  Ms. Dohn?

4           MS. DOHN:  Yes, my understanding is there will

5  no -- it won't be a mental status assessment as far as any

6  kind of test that's administered.  It will be a clinical

7  interview.

8           THE COURT:  Okay.  All right.

9           Anything further from you, Mr. Dwyer?  And then

10  I'll give Ms. Dohn last words briefly.

11           MR. DWYER:  Depending on how Your Honor rules, I

12  may have something in connection with the ruling.  But I'll

13  have to wait and see how Your Honor rules.

14           THE COURT:  Oh, okay.  I am not going to -- I'm

15  going to reserve decision.  I'm going to write on this,

16  because there's been, you know, if you take an appeal -- or

17  if somebody takes an appeal, it's easier, I think, for Judge

18  Neals to have it all laid out.

19           MR. DWYER:  Okay.

20           THE COURT:  Rather than reading a transcript.

21           MR. DWYER:  Totally understand.  So this would be

22  my other issue, which I would raise with Your Honor, which is

23  if Your Honor is going to overrule our objections and order

24  the Rule 35 exam, we'll be taking an appeal to Judge Neals,

25  and, therefore, I would be requesting a stay of the exam

 1  until we're able to take the appeal.  Obviously, we take the

 2  appeal with the time limitations set by the rules.  So it's

 3  not like we just let it sit out there forever.

 4           THE COURT:  Right.  If that's what I decide to do,

 5  then you -- I won't moot your appeal by requiring her to

 6  undergo the IME during the pendency.

 7           All right.  Anything further, Mr. Dwyer?

 8           MR. DWYER:  Oh, no, no.  I thought Ms. Dohn was

 9  having the last word.

10           THE COURT:  Okay.

11           Your turn, Ms. Dohn.  Any rebuttal?

12           MS. DOHN:  Your Honor, I'm just going to keep this

13  very brief.  Just, to knock it out, I think it's abundantly

14  clear, but the defendants in this matter are three

15  individually named defendants.  They never retained

16  Dr. Ghilain.  They never conducted an IME.  And so that has

17  already actually been litigated in this case.  So I don't

18  think that argument holds any water.

19           THE COURT:  Can you just remind me what Dr. Ghilain

20  was sort of retained for and what proceeding and by whom?

21           MS. DOHN:  Absolutely.  Dr. Ghilain was retained to

22  conduct an IME of the plaintiff as part of the disability

23  requirement application that she submitted to the judiciary.

24  That is the subject of a matter that's pending before Judge

25  Hurd in Mercer County.  The defendants, Judge Mizdol, Laura

1  Simoldoni, and Diana Moskal, are not parties to that action.

2  There is no state entity involved in the action before

3  Your Honor.  That -- Dr. Ghilain was never retained in

4  anticipation of this litigation.  She was not -- she was not

5  named as either a fact or an expert witness in this

6  litigation.  And the defendants in this matter are not privy

7  to that IME report.  That is completely and wholly unrelated

8  to this matter.

9           So to the extent that any argument is made that she

10  is -- that the plaintiff has undergone an IME for purposes of

11  this litigation, it's just simply not true.

12           And what I wanted to speak very briefly about in

13  Conforti and Bowen kind of the distinguishing factors is the

14  court in Conforti specifically noted that plaintiff had not

15  placed the depression anxiety in controversy within the

16  meaning of Rule 35.  Plaintiff has repeatedly reiterated that

17  his damages will be limited to standard emotional distress,

18  and plaintiff has represented that he will not introduce

19  evidence that defendants' conduct caused or exacerbated any

20  clinical conditions.

21           That's simply not the case here.  And in Bowen,

22  Your Honor, the plaintiff, Joseph Bowen had consistently

23  represented to the Court that he intended to produce his

24  treating physician, Dr. Patel, as a fact witness at trial to

25  testify as to the mental condition in the summer of 2000.

1        So, again, these are very fact-specific inquiries

2   as to whether or not an IME should be ordered.  And in that

3   case, he was only going to be testifying, "he" being the

4   treating physician, was always going to be offered as a fact

5   witness at trial to offer testimony -- past work-related

6   stress in order to explain why he did not return to work

7   after June 2000.

8        So, again, there were very limited and tight

9   parameters and very significant clear representations that

10  were made.  And that's simply not the case here.  There is an

11  argument being made by plaintiff that she suffered emotional

12  distress at the hands of these defendants that caused her to

13  go to a treating physician who diagnosed with these maladies,

14  and that as a result of this emotional distress attributed to

15  these defendants manifested themselves in severe emotional

16  distress so severe that it required surgical intervention.

17        And, Your Honor, to the point where we had all this

18  opportunity to depose the treating physicians, I think it's

19  really important to remember the context and history of this

20  specific case.  And there was a very clear point in this case

21  where we thought the matter might be dismissed because

22  plaintiff would never appear for a deposition.  She appeared

23  for a deposition after several notices, after several court

24  orders on October 13th.  Just over two weeks after that is

25  that when we served notice that we had retained an expert,

 1  Dr. Weiss.  So there has been no hiding the ball.  There has

 2  been no dilatory conduct for the defendants.  We have been

 3  moving forward on this case since day one.  It was just not

 4  clear plaintiff was ever going to sit to be deposed.

 5            So I think that's important for the context of this

 6  case.

 7            And unless Your Honor has any questions, I don't

 8  have any further argument in rebuttal.

 9            THE COURT:  No.  I don't.

10            Mr. Dwyer anything further?

11            MR. DWYER:  I said I would let Ms. Dohn have the

12  last word.  And I'll --

13       (Simultaneous conversation)

14            THE COURT:  Okay.  No.  It looked like you had

15  something to say, and I'm a little bit --

16       (Simultaneous conversation)

17            THE COURT:  -- about hearing what people have to

18  say.

19            MR. DWYER:  You know, I think Your Honor heard me,

20  which is that all the arguments about procedural history of

21  the case are neither here nor there, because I've already

22  said to the Court point-blank that if the defendants want to

23  depose Dr. Acquaviva or somebody else, I have no objection to

24  that.  So I am not trying to prevent people from getting

25  discovery.  I've never been trying to prevent people from

 1   getting discovery.  But you --

 2              THE COURT:  I understand.

 3              MR. DWYER:  You heard me the first time.

 4        Your Honor --

 5              THE COURT:  Okay.

 6              MR. DWYER:  -- totally unrelated to this, I'm just

 7   going to throw this out there whether or not Your Honor might

 8   want to consider setting a date for another case management

 9   conference in this case down the road, because regardless of

10   what happens, the parties are going to have to decide what to

11   do with whatever discovery is left.  You know, I don't know

12   if the defendants, without an IME, still want to submit an

13   expert report, which is totally their right.  And then, you

14   know, we ought to set a time for doing the pretrial order in

15   this case.

16              THE COURT:  Oh, certainly.  Believe me, I'll follow

17   up at -- but, you know, we'll see what happens.  We have to

18   conclude expert -- the expert phase of the case before

19   another date is really necessary.  I guess after that, it

20   might be setting a motions schedule or, if the case is going

21   to go straight to trial, ordering a final pretrial order to

22   be prepared and that sort of thing.

23              Don't worry, Mr. Dwyer.  I'm very -- I'm diligent

24   in moving my cases along.  Maybe a little too much so,

25   sometimes.

1          MR. DWYER:  Oh, no.  I just wanted to throw that

2    out there, Judge.

3          THE COURT:  Okay.  There was one thing I wanted to

4    raise.  It's more than housekeeping.

5          Look, we've discussed many times in this case that

6    medical information of the plaintiff is being placed on the

7    docket, on the public docket.  And, you know, it's very

8    personal information to be putting on the docket.  And then

9    as I was preparing for this hearing and reading all the

10   motion papers, I even saw that there was a reference to the

11   plaintiff's father's medical condition.  And that's a

12   complete third party.

13         So I know that there's been a discovery

14   confidentiality order in draft for a while.  I'd urge you all

15   to use it for the protection of your client's confidential

16   information.  I even looked at Federal Rule 5.2 and -- you

17   know, which makes mandatory for the Court to redact certain

18   information.  This information doesn't fall within the scope

19   of 5.2.  But it's created some problems that the information

20   is going on the docket.  You know, Ms. Dohn, for example, had

21   to send Dr. Acquaviva's records directly to my chambers.  And

22   it really should be filed under seal on the docket.  That's

23   the appropriate way to create a record.

24         And, you know, we're sort of going back 20 years in

25   time to have confidential things sent directly to chambers.

1          So I just urge you to please follow through on

2     that.  It's an uncomfortable situation.  Personal information

3     on the Internet, the cases are legion how they can be misused

4     by the public.  And I don't want anything untoward to happen

5     to anyone.

6          MR. DWYER:  So if I may address that, Your Honor,

7     you know, I'm kind of a late arrival to this case --

8     speaking, given it was filed in 2017, and I only entered

9     appearance last summer.

10          At some point after I entered an appearance,

11     Ms. Dohn raised with me the issue of confidentiality order

12     that apparently she had raised with prior counsel.  And I

13     said, you know, "Sure, could you send it to me."  And she

14     eventually did send it to me.  And when I got it, I had some

15     questions about it, some of which related to exactly how did

16     she see this applying to information that had already been

17     disclosed or obtained many months ago.  I'm pretty sure that

18     I sent her that email in November.  And I have never heard

19     back from her on it.

20          So I have tried to keep that discussion moving

21     along, but, you know, it takes two parties to have a

22     discussion.  I can't just talk --

23          (Simultaneous conversation)

24          THE COURT:  Well, let me just -- rather than --

25     I -- I am not looking for parties to blame one another or

1    anything.  If you need my services in tailoring the discovery

2    confidentiality order or, you know, helping resolve disputes

3    about terms that you, you know, the parties can't agree on,

4    I'm happy to do that.

5            My point is only that it's very unusual to have

6    this level of medical information placed on the public docket

7    for the world to see.  And it's making me, frankly,

8    uncomfortable.

9            MS. DOHN:  Your Honor, your point is well-made.  I

10   sent the discovery confidentiality agreement twice.  I'm

11   happy to follow up with Mr. Dwyer, but I think all medical

12   information clearly would have to be marked confidential, and

13   we would happy treat it as such.  We can --

14       (Simultaneous conversation)

15           THE COURT:  I mean, a lot -- don't -- I am not

16   going back retroactively and sealing.  Once, as some judges

17   have said, the cat is out of the bag and it's on the public

18   docket, the genie does not go back into the bottle.

19           But I particularly became uncomfortable reading

20   about third-parties' medical information that was just placed

21   on the docket.

22           So please, please do something.

23           All right.  Thank you.  I am reserving decision.  I

24   will issue a written opinion as soon as I'm able to.  I try

25   to get to things expeditiously, but our workload right now is

|Hearing
|17-cv-13111, January 21, 2022

```
 1   crushing.  So I can't make any promises as to exactly when.
 2   Okay?
 3             MR. DWYER:  Thank you have a good weekend.
 4             THE COURT:  Thank you.  You too.
 5                   (Conclusion of proceedings)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

|Hearing
|17-cv-13111, January 21, 2022                                          36
|Certification

```
 1                          Certification

 2       I, SARA L. KERN, Transcriptionist, do hereby certify

 3   that the 36 pages contained herein constitute a full, true,

 4   and accurate transcript from the official electronic

 5   recording of the proceedings had in the above-entitled

 6   matter; that research was performed on the spelling of proper

 7   names and utilizing the information provided, but that in

 8   many cases the spellings were educated guesses; that the

 9   transcript was prepared by me or under my direction and was

10   done to the best of my skill and ability.

11       I further certify that I am in no way related to any of

12   the parties hereto nor am I in any way interested in the

13   outcome hereof.

14

15

16

17

18   s/ Sara L. Kern                   31st of January, 2022

19   _____      _____
     Signature of Approved Transcriber              Date

20

21
     Sara L. Kern, CET**D-338
22   King Transcription Services
     3 South Corporate Drive, Suite 203
23   Riverdale, NJ  07457
     (973) 237-6080
24

25
```