**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DEBORAH GROSS-QUATRONE : | |
| : | Civ. A. No. 2:17-cv-13111-SDW-LDW |
| Plaintiff, : | |
| : | |
| v. : | **PLAINTIFF'S RESPONSE TO** |
| : | **STATEMENT OF UNDISPUTED** |
| BONNIE MIZDOL, DIANA MOSKAL, : | **MATERIAL FACTS AND STATEMENT** |
| LAURA SIMOLDONI, and JOHN and : | **OF ADDITIONAL FACTS** |
| JANE DOE 1-10, : | |
| : | |
| Defendants. : | |
| : | |

Plaintiff Deborah Gross-Quatrone submits the following response to Defendants' Statement of Undisputed Material Facts along with a Statement of Disputed Material Facts.

**<u>As To The Parties</u>**

1.    Admitted.

2.    Admitted only that that date range is consistent with when Plaintiff first appeared and when she was last in the office.  Plaintiff objects to the phrase "assigned."  It is believed that the dates Plaintiff was "assigned" was different from the dates cited herein.

3.    Admitted.

4.    Admitted.

5.    Admitted.

6.    Admitted.  It is admitted that AJ Mizdol was a supervisor.  There may have been others who supervised Plaintiff.

7.    Paragraph 7 contains conclusions of law which require no response, specifically who was a "supervisor."  Admitted that Moskal and Simoldoni are not judges.

8.    Denied.  Simoldoni and Moskal had the ability to impact Plaintiff's workload and participated in disciplinary and other matters, including by removing Plaintiff's law clerk.  GQ Tr. at 214-15 (Certification of Kathleen Dohn, Esquire ("Dohn Cert."), Exh A).  Lauren Little testified that Moskal had the ability to have a judge moved.  Little Tr. at 27 (Ferrara Cert., Exh. C).

**As To Plaintiff's Initial Assignment To The Passaic Vicinage**

9.    Denied.  Plaintiff was relating what she had been told by Judge Melchionne.

10.    Denied.  The testimony cited does not support the facts in this paragraph.

11.    Denied.  Plaintiff has testified that that was the "scuttlebutt…."

12.    Denied.  Plaintiff was ordered to appear in Passaic based on Mizdol's wishes.  GQ Tr. at 26:21-21, 27:7-9 (Dohn Cert., Exh. A).

13.    Denied.  Plaintiff denies Defendants' attempt to mischaracterize Plaintiff's testimony.  Plaintiff testified that "Judge Mizdol, at the eleventh hour,

maybe a day or two before my swearing in, voted to send me to Passaic."  GQ Tr.
at 26:21-23 (Dohn Cert., Exh. A).  Plaintiff also testified that "she didn't want me,
a female, to, I guess continue to be in Bergen County."  GQ Tr. 27:7-9 (Dohn
Cert., Exh. A).

14.    Admitted that that was Defendant Mizdol's testimony.  But Defendant
Mizdol admitted that she was part of the decision.  Mizdol Tr. at 17:22-18:8
(Certification of Ralph P. Ferrara, Esquire ("Ferrara Cert., Exh. A).

15.    Admitted that that was Defendant Mizdol's testimony.

16.    Denied.  Admitted that Plaintiff practiced before and was a municipal
judge.  Denied that Defendant Mizdol never made comments about Plaintiff's
feminity, including "a jokey type of thing, like, oh, what's Vanna wearing this
year."  GQ Tr. 105:7-8 (Dohn Cert., Exh. A).

**As To Plaintiff's Assignment To The Bergen Vicinage**

17.    Admitted.

18.    Admitted.

19.    Admitted.  Ro Cuccio recalled that Mozkal had called Plaintiff "Judge
Diva."  GQ Tr. at 112:22-113:3  (Dohn Cert., Exh. A).  Mozkal admitted that Diva
was used to describe Plaintiff.  Mozkal Tr. at 287-288 (Ferrara Cert., Exh. B).

20.    Admitted.

## As To Plaintiff's Protected Class Of One

21.     Admitted that to her knowledge that was true.  But that "I don't have those facts of what went on between Judge Mizdol and a particular judge."  GQ Tr. at 15:23-25 (Dohn Cert., Exh. A).

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Admitted.

27.     Admitted in part.  Admitted that Plaintiff testified to that, but that she also testified that she was not looking at the other judges.  GQ Tr. 87:24-88:4 (Dohn Cert., Exh. A).

28.     Admitted but that Plaintiff testified that "I don't know who else fits in this category…. I thought I was there to work and be a judge."  GQ Tr. at 87:24-88:4 (Dohn Cert., Exh. A).

## As To Interactions With AJ Mizdol

29.     Admitted in part; denied in part.  It is admitted that Mizdol made that statement.  It is denied that this was not discriminatory or harassing based on her gender.  It was part of the overall discriminatory or harassing behavior.

30.     Admitted.  By way of further response, Plaintiff felt pressured to attend the retirement party by Mizdol.

31.     Admitted in part; denied in part. Admitted as to the first sentence. As to the second sentence, Plaintiff's response in full stated:  "No.  That's not Judge Mizdol's style here and in Emails, that's not what happens.  It's just pressure.  You got to wait until you get her in person, and then you get terrorized, cursed at, screamed at, slammed on the desk.  Then you get that."  GQ Tr. at 51:20-25 (Dohn Cert., Exh. A).

32.     Admitted.  By way of further response, Plaintiff was instructed to appear at 8:00 am which was before business hours.  Judge Kazlau, a man, was informed to appear at 8:30 am, which was within business hours.  GQ Tr. at 57:1-9 (Dohn Cert., Exh. A).

33.     Admitted.

34.     Admitted.

35.     Admitted in part; denied in part.  Admitted that Mizdol testified as to this.  This is contrary to what Judge Kazlau told Plaintiff when she asked him about it in December.  GQ Tr. at 65:8-66:1 (Dohn Cert., Exh. A).

36.     Admitted.

37.     Admitted.

38.    Admitted in part.  Plaintiff testified that she received that spot so that Mizdol could keep an eye on her.  GQ Tr. at 66:23-67:68:21 (Dohn Cert., Exh. A).

39.    Admitted.

40.    Admitted.

41.    Denied.  Diana Moskal testified that she used those terms to refer to Plaintiff.  Moskal Dep. at 287-288 (Ferrara Cert., Exh. B).  Further, Ro Cuccio stated that Moskal had called Plaintiff Judge Diva.  GQ Tr. at 112:22-113:3 (Dohn Cert., Exh. A).

42.    Admitted with the exception that "some of the courthouse staff had complained about Plaintiff's demeanor" is not supported by the cite.

43.    Admitted.

44.    Admitted.

45.    Admitted.

46.    Denied.  Defendant Mizdol said that she yelled at Plaintiff.  But when speaking about men she would speak sternly.  Mizdol Tr. at 83-85 (Ferrara Cert., Exh. A).

47.    Admitted.

48.    Admitted.  Plaintiff does not know what Mizdol told the other judges. Plaintiff just knows that when she search, she found the other two male judges in

Bergen County had Linkedin pages and other superior court judges also had pages. GQ Tr. at 231:7-19 (Dohn Cert., Exh. A).

**As To Issue With Jessica Mulligan**

49.    Denied.  It is denied that the meeting was about the two rumors.  The two rumor came up during the meeting.  It is also denied that Jessica Mulligan was upset.  They also discussed rumor regarding Plaintiff.  GQ Tr. at 126:11-128:23 (Dohn Cert., Exh. A).

50.    Admitted that that was Defendant Mizdol's testimony.

51.    Admitted.

52.    Admitted that that was Mizdol's testimony.

**As To Issues With Law Clerk**

53.    Admitted in part; denied in part.  It is denied that Ms. Comas worked from 7:30 am to 7:00 pm on weekdays, as well as a Sunday.

54.    Admitted that Plaintiff had not received a copy of the memo as it was circulated in Bergen County before Plaintiff was there.

55.    Admitted.

56.    It is denied that Ms. Comas was upset upon receiving the email.

57.    Admitted.

58.    Admitted.

59.    Admitted in part; denied in part. The words hostile work environment were not part of the complaint.

60.    Admitted that Mizdol testified as to this.

61.    Denied.  Plaintiff was only informed that Ms. Comas would no longer be in her chambers.

62.    Denied as stated.  It was part of the overall discrimination against Plaintiff.  GQ Tr. at 84:8-10 (Dohn Cert., Exh. A).

63.    Denied.  The note states taped meeting on phone.  It does not say that the taping was successful.

64.    Admitted in part; denied in part.  Denied that the first sentence is supported by the cited material.

**As To Other Claims Against TCA Simoldoni And FDM Moskal**

65.    Admitted that it states that among other things.

66.    Admitted that it states that among other things.

67.    Admitted that it states that among other things.  This statement was witnessed by Laura Little.  Little Tr. at 28 (Ferrara Cert., Exh. C).

68.    Admitted that it states that among other things.  This statement was witnessed by Laura Little.  Little Tr. at 32 (Ferrara Cert., Exh. C).

69.    Admitted that it states that among other things.

70.    Admitted.

**As To December 21, 2015 Meeting**

71.    Admitted that the meeting occurred.

72.    Admitted.

73.    Admitted.  It is admitted that that is what Mizdol testified to.

74.    Admitted.

75.    Admitted.

76.    It is admitted that the recorder was on during the meeting.

77.    Admitted.

78.    Admitted that that was what Simoldoni testified to.  It is denied that Simoldoni knew it was a recording device before she reached in Plaintiff's purse and retrieved it.  Indeed, Moskal testified that she exclaimed "What is this?  What is this?" after pulling it out of Plaintiff's purse.  Moskal Tr. at 270, 275 (Ferrara Cert., Exh. B).

79.    Admitted that Plaintiff testified that it was in her purse and that the purse was open.

80.    Admitted in part; denied in part.  It is admitted that Simoldoni seized the recorder.  It is denied that she knew it was a recorder before she seized it. Moskal Tr. at 270, 275 (Ferrara Cert., Exh. B).

81.    Admitted.

82.    Admitted in part; denied in part.  The first sentence is admitted.  It is admitted only that the recorder was returned to Plaintiff at some point.

83.    Admitted.

84.    Denied.  Judge Grant, at the instigation of Defendant Mizdol, confirmed her request to file a grievance.

85.    Admitted.

**As To ACJC Proccedings**

86.    Admitted.

87.    Admitted that that was Mizdol's testimony.  Mizdol had a choice.

88.    The declaration does not say who or when it was reported.  There are no details in the declaration.

89.    The ACJC Complaint, being a document, speaks for itself.

90.    The ACJC Presentment, being a document, speaks for itself.

91.    The ACJC Presentment, being a document, speaks for itself.

92.    The ACJC Presentment, being a document, speaks for itself.

93.    The ACJC Presentment, being a document, speaks for itself.

94.    The January 24, 2019 Order, being a document, speaks for itself.

95.    The January 24, 2019 Order, being a document, speaks for itself.

**As To Transfer To Essex Vicinage**

96.    Admitted.

97.     Admitted as to the reason for the transfer.  Mizdol told Judge Grant that she could not work with Plaintiff and that the relationship was irretrievably broken.  Mizdol Tr. at 68-69 (Ferrara Cert., Exh. A).

98.     While this may be true, Mizdol told Judge Grant that she could not work with Plaintiff and that the relationship was irretrievably broken.  Mizdol Tr. at 68-69 (Ferrara Cert., Exh. A).  Mizdol left Judge Grant with no choice but to transfer Plaintiff.

## STATEMENT OF UNCONTESTED MATERIAL FACTS

1.     Plaintiff became a New Jersey Superior Court Judge on March 3, 2015. GQ Tr. at 18:5 (Dohn Cert., Exh. A).

2.     Plaintiff was initially appointed to become a Judge in Bergen County. However, Plaintiff was immediately transferred to the Passaic Vicinage in Paterson, New Jersey as a result, in part, of Judge Mizdol's preference and her vote that Plaintiff not be assigned to the Bergen Vicinage despite her earlier statements and positions to the contrary.  GQ Tr. at 25:24-26:23 (Dohn Cert., Exh. A).

3.     On June 23, 2015, Plaintiff was notified that she would be re-assigned to the Bergen Vicinage and was instructed to contact Judge Mizdol to make arrangements for her transfer.  GQ Tr. at 32:16-33:7 (Dohn Cert., Exh. A).

4.     Plaintiff contacted Judge Mizdol by telephone on June 23, 2015 as instructed and learned the transfer would be effective July 6, 2015.  GQ Tr. at 37:1-

39:1 (Dohn Cert., Exh. A).  During this telephone call, Plaintiff informed Judge Mizdol of her upcoming, pre-approved vacation time.  Id.  Judge Mizdol responded by yelling, "Jesus Christ, do you have any other fucking vacation that I don't know about?" and denied Plaintiff's request for additional time to pack her personal things. Id.; GQ Tr. at 53:22-23 (Dohn Cert., Exh. A).

5.     Plaintiff first reported to work in the Bergen Vicinage on July 6, 2015 at 8:00 a.m. for a meeting with Judge Mizdol, as instructed, in Judge Mizdol's chambers.  GQ Tr. at 54:3-55:25 (Dohn Cert., Exh. A).

6.     She was assigned to the Family Division.  During this meeting, Judge Mizdol read a list of special rules and instructed her to follow those rules.  GQ Tr. at 55:24-56:17 (Dohn Cert., Exh. A).

7.     The rules included prohibitions against Plaintiff attending medical appointments during work hours, warnings about her hearing that Plaintiff was seen leaving the courthouse during work hours, and also that taking lunch was strongly discouraged.  Id.  On the same day, Judge Christopher Kazlau was also transferred to the Bergen Vicinage and met with Judge Mizdol immediately following Plaintiff's meeting with her.  GQ Tr. at 57:1-5 (Dohn Cert., Exh. A).

8.     Judge Mizdol met with Judge Kazlau at 8:30 am, which was normal business hours.  Id.  None of the rules Judge Mizdol imposed on Plaintiff were imposed on Judge Kazlau or even mentioned to him.  GQ Tr. at 57:7-9 (Dohn Cert.,

Exh. A).  Nor were they applied, upon information and belief, to any other judges in the Bergen Vicinage reporting to Judge Mizdol.

9.    Plaintiff was also assigned a parking space which was located immediately next to Judge Mizdol, which, upon information and belief, was assigned at Judge Mizdol's direction to permit her to monitor when Plaintiff arrived and left and to further intimidate her.  GQ Tr. at 66:23-67:12, 82:1-7 (Dohn Cert., Exh. A). Upon information and belief, no other new judges were assigned spaces on that side of the lot or on that floor of the parking garage entrance.

10.    Judge Mizdol made Plaintiff explicitly aware that she was being closely watched.  Judge Mizdol would call Plaintiff's chambers at 8:25 am, 8:30 am and 1:30 pm to check that Plaintiff was there.  GQ Tr. at 92:16-93:18 (Dohn Cert., Exh. A).

11.    Judge Mizdol called Plaintiff's chambers at 1:30 p.m. and then, when the phone went unanswered, sent an e-mail stating, "tried to call your chambers- no voicemail picked up.  Can you give me a call?"  When Plaintiff returned her call shortly thereafter and informed Judge Mizdol that she had been at lunch, Judge Mizdol reminded Plaintiff of her rule that taking lunch was discouraged. Plaintiff also explained to Judge Mizdol that she believed the voicemail was not working, which turned out to be the case.  GQ Tr. at 93:1-18 (Dohn Cert., Exh. A).

12.    Plaintiff was also required to send her daily calendar to Judge Mizdol by 3 p.m. each day.  Second Amended Complaint ("SAC") ¶ 25 (Dohn Cert., Exh. P); Notes 7/6/15 (Ferrara Cert., Exh. D).

13.    On or about August 6, 2015, Judge Quatrone's law clerk, Nadya Comas, appeared at her chambers for her first day of what Judge Quatrone understood to be permissible transition.  Judge Quatrone made no effort to hide her law clerk's presence and the law clerk was instructed to report to the Bergen Vicinage human resources department to arrange for a parking pass and to otherwise complete the intake process.  SAC ¶ 19; Notes 8/4/15 (Ferrara Cert., Exh. D). Plaintiff was in a shared chambers with another judge (Judge Jane Gallina-Mecca) and her staff.  Plaintiff and Judge Mecca's law clerk shared a common desk.

14.    In late August or early September of 2015, Plaintiff was summoned to a meeting with Judge Mizdol in her chambers.  Judge Mizdol expressed that some of the courthouse staff had complained about Plaintiff's demeanor.  Plaintiff expressed surprise and inquired as to exactly what complaints Judge Mizdol was referring to.  Judge Mizdol did not provide specifics as to who complained.  Plaintiff offered to resign and in response Judge Mizdol stated, "you come here with your fancy clothes and bare legs" and you expect me to believe this?  Judge Mizdol then also implied that Plaintiff couldn't handle the job.  GQ Tr. at 117:17-118:25 (Dohn Cert., Exh. A).

14

15.    In a separate interaction with Judge Mizdol in the summer of 2015, Judge Mizdol stated to Plaintiff that she "laughs when I see you with your beach hair and flip-flops."  Plaintiff never wore flip-flops during work hours, but did wear them while walking into the Courthouse due to the construction in the parking area.   GQ Tr. at 114:2-115:20 (Dohn Cert., Exh. A).

16.    In September of 2015, Plaintiff learned that courthouse staff were freely calling her "The Diva Judge" and commenting about her "fancy clothes and a big ring."  GQ Tr. at 107:8-23 (Dohn Cert., Exh. A); Moskal Dep. at 285-297 (Ferrara Cert., Exh. B).  This allegation supports the reasonable inference that the court house staff felt that they could insult a sitting judge with name calling impunity, which could only come from Judge Mizdol.

17.    Defendant Diana Moskal said she was working with Judge Mizdol and Ms. Simoldoni on "getting rid of Judge Gross-Quatrone."  Little Tr. at 32 (Ferrara Cert., Exh. C).

18.    Defendant Moskal, however, did admit that there was talk about her nice clothes, the way she carried herself, and her jewelry.  Moskal Tr. at 285-297 (Ferrara Cert., Exh. B).

19.    Moskal said there was talk of a Diva at a team leaders and assistant managers meeting.  Moskal Tr. at 287:25-288:11 (Ferrara Cert., Exh. B).

15

20.    Ro Cuccio said that Moskal had called Plaintiff "Judge Diva" at Team Leaders meeting.  GQ Tr. at 112:22-113:3 (Dohn Cert., Exh. A).

21.    Karen Francis said that Moskal called Plaintiff a bimbo.  Moskal Tr. at 297 (Ferrara Cert., Exh. B).

22.    At another meeting, Kathy Palmer, when speaking about Plaintiff, said "The bitch won't give me the files."  GQ Tr. at 87:6-19 (Dohn Cert., Exh. A).

23.    Moskal informed staff to go into Plaintiff's chambers, look around and listen.  Then they were instructed by Moskal to report back so that they could get rid of Plaintiff.  Little Tr. at 27-28 (Ferrara Cert., Exh. C).  She would report back to Mizdol.  Id.

24.    On September 3, 2015, Judge Mizdol once again summoned Plaintiff to her chambers.  Upon arrival, Judge Mizdol and Defendant Laura Simoldoni were present.  At this meeting, Judge Mizdol was irate and abusive to Plaintiff.  She repeatedly yelled and screamed at Plaintiff in front of Defendant Laura Simoldoni.  Among other things, she yelled that Plaintiff was "putting the judiciary at risk of a lawsuit" by statements Plaintiff allegedly made to another courthouse employee, Jessica Mulligan.  GQ Tr. at 160 (Dohn Cert., Exh. A).  Judge Mizdol also stated, "I don't know what kind of pedestal they (referring to the male judges Plaintiff worked with and socialized with in Passaic) put you on, but I'm going to knock you off."  GQ Tr. at 27-28, 152 (Dohn Cert., Exh. A).  Plaintiff insisted that she had said

16

nothing inappropriate or actionable to Ms. Mulligan and told Judge Mizdol that she should confirm with Plaintiff's secretary, Maria DeLeon, who was present for the subject conversation with Ms. Mulligan, that she said nothing inappropriate or actionable.  GQ Tr. at 136 (Dohn Cert., Exh. A).  Judge Mizdol then ordered Simoldoni to call Ms. DeLeon to her chambers and, in the presence of Defendant Laura Simoldoni and Plaintiff, immediately asked her if Plaintiff had ever yelled at her.  GQ Tr. at 134 (Dohn Cert., Exh. A).  Plaintiff and Ms. DeLeon were confused and stunned by Judge Mizdol's volume and anger, and Ms. DeLeon glanced at Plaintiff for a moment.  As soon as this happened, Judge Mizdol yelled at Ms. DeLeon, "don't look at Judge Gross-Quatrone, you look at me!  This is very serious and I need you to tell the truth" implying that Ms. DeLeon was going to lie before she even spoke.  GQ Tr. at 133-135 (Dohn Cert., Exh. A).  Ms. DeLeon then informed Judge Mizdol that Plaintiff never raised her voice or yelled at anyone, including herself.  Plaintiff returned to her chambers and was physically ill and had a nosebleed.

25.    On September 28, 2015, Plaintiff's secretary received a call from a courthouse staff member asking if the Plaintiff would take a case, since Judge Mizdol believed that Plaintiff had no cases on her calendar.  GQ Tr. at 177-182 (Dohn Cert., Exh. A).  Plaintiff's secretary tried to explain that Plaintiff had just received a case and was reviewing the file, but she would ask the Plaintiff to take

the new case. Id. The staff member replied that she would call another Judge to take the new case. Id. Plaintiff's secretary explained what had occurred to the Plaintiff and Plaintiff was immediately concerned that she would be yelled at again by Judge Mizdol and accused of refusing a case. Id. Plaintiff immediately attempted to call her Presiding Judge, Peter Melchionne, but was advised by his secretary Theresa Schenck that he was on the bench. Id. Plaintiff explained the scenario to Ms. Schenck who replied, "don't worry its fine, I will let him know." Id. at 181. No sooner did Plaintiff hang up the phone, when Judge Mizdol barged into Plaintiff's chambers and yelled, in the presence of Plaintiff's secretary and court clerk, "You are not on the record!", "What the fuck is going on here?", "Who are you to refuse a case?" belittling and demeaning Plaintiff if the presence of her staff. Id. at 181. Judge Mizdol was abusive and angry towards Plaintiff and remained in Plaintiff's chambers for approximately forty-five minutes. Id. at 182. Judge Mizdol spent this time alleging that Plaintiff had refused to hear a case and would not accept Plaintiff's simple and direct explanation as to how that was untrue. Id. at 181-183.

26.     On October 1, 2015, Plaintiff was called into a meeting at 8:30 a.m. with Judge Melchionne to discuss a new internal judiciary report concerning outstanding motions. At the meeting, Plaintiff received a copy of the new report. Judge Melchionne advised Plaintiff that it appeared she had not submitted any updates for any of her motions for the prior six weeks, so he had no idea what was

going on with her motions.  Plaintiff advised Judge Melchionne that there must have

been some mistake because her secretary had given a marked-up motion calendar to

the appropriate staff member after each motion cycle and all motions were

completed.  Judge Melchionne also handed Plaintiff a copy of an order from a case

she decided on September 29, 2015, with his own handwritten notes on it stating that

the order was horrible.  Plaintiff was visibly upset and apologized.  Plaintiff could

not understand how Judge Melchionne had this order in his possession so quickly,

as it had just been entered and the files had only been returned less than twenty-four

hours before this meeting. After the meeting, Plaintiff inquired with her motion team

regarding how her motion list could have not been updated.  Her team leader advised

that she had received the marked up motion calendar from Plaintiff's secretary, but

the information was not entered into the computer system, making it appear as

though Plaintiff was not doing her job.  GQ Tr. at 188-191 (Dohn Cert., Exh. A);

Notes 10/1/15 (Ferrara Cert. Exh. D).

27.    Sometime between October and December 2015, Judge Mizdol and/or

Diana Moskal issued a directive that no courthouse staff were permitted to enter

Plaintiff's chambers alone, further damaging the Plaintiff's reputation and causing a

more hostile environment for Plaintiff and increased disparaging comments being

made about the Plaintiff.  Little Tr. at 28 (Ferrara Cert., Exh. C); GQ Tr. at 188-189

(Dohn Cert., Exh. A).

19

28.    On December 2, 2015, Plaintiff attended a mandatory all judges' lunch
meeting.    After the meeting, Laura Simoldoni told Plaintiff that Judge Mizdol
wanted to see her.  Judge Mizdol was waving a piece of paper in the air and began
screaming at Plaintiff, "read this!" Plaintiff read it, and Judge Mizdol screamed,
"read it again, this is actionable!"  Judge Mizdol was waiving and referring to an e-
mail Plaintiff had sent to her law clerk on November 30, 2015, inquiring as to the
subject of an unscheduled meeting the law clerk had attended with Defendant, Diana
Moskal.  After the meeting, Plaintiff returned to her chambers and had a severe
nosebleed.  GQ Tr. at 100:1-4. 197:24-200:4, 206:1-4 (Dohn Cert., Exh. A); Notes
(Ferrara Cert., Exh. D).

29.    On December 10, 2015, Defendant Laura Simoldoni appeared at
Plaintiff's chambers at 5:30 p.m. and, in the presence of Plaintiff's husband, advised
Plaintiff that "Nadya [Comas] is in a bad way."   Plaintiff asked, "what does that
mean?" Defendant Laura Simoldoni responded, "yeah Judge, it's not going to work
out and she's not going to be working for you."   The Plaintiff then asked Ms.
Simoldoni, "who will complete the work for the cases scheduled for tomorrow?"
Ms. Simoldoni told Plaintiff's secretary that she should complete the law clerk's
work and have the files ready for the hearings the following day.  Plaintiff's secretary
stayed at work until almost 7:00 p.m., trying to prepare the files for the following
day that were not completed and was forced to take the files home with her to work

on them.  Plaintiff had a nosebleed at that point in the presence of her husband and secretary.  Ms. Simoldoni did not state to Plaintiff that the law clerk had alleged that Plaintiff had created a hostile working environment.  She also failed to mention any concern over the law clerk's start date of August 6, 2015.  GQ Tr. at 214:5-215:6 (Dohn Cert., Exh. A); Notes (Ferrara Cert., Exh. D)

30.    On December 11, 2015, Ms. Simoldoni wrote Judge Mizdol a memo claiming that Ms. Comas had alleged that Plaintiff had created a "hostile working environment," and had required her to start working three weeks before her "official start date."  The memo concluded that Plaintiff's behavior towards the law clerk was "completely inappropriate."  December 11, 2015 Memo (Ferrara Cert., Exh. E).

31.    On December 14, 2015, Plaintiff was summoned to another meeting in Judge Mizdol's chambers.  Plaintiff explained to Judge Mizdol that she had recently confronted the law clerk with a lie the law clerk had told on December 3, 2015, and that being caught lying was probably the true impetus for the law clerk fabricating allegations of a hostile working environment.  Judge Mizdol responded by yelling that Plaintiff's husband should not have been present in chambers, and that the law clerk would not be returning to her. Plaintiff was concerned about the workload without a law clerk and asked if a new law clerk would be hired.  Judge Mizdol told Plaintiff, "there's no money in the budget for a new law clerk.  You won't have one for 8-9 months."  Notes 12/14/15 (Ferrara Cert., Exh. D).

21

32.    On December 21, 2015, Plaintiff attended a meeting with Judge Mizdol that later included Laura Simoldoni, Diana Moskal and Judge Peter Melchionne. The meeting was demanded by Judge Mizdol to advise Plaintiff of what arrangements would be made since Ms. Comas would not be replaced. Plaintiff was recording the meeting with a digital recording device she had in her pocketbook which was placed next to her on the floor. During the meeting, while the Plaintiff was alone with Judge Mizdol, Judge Mizdol stated that she was trying to prevent an "ACJC complaint" from being filed against Plaintiff concerning Nadya Comas. At the meeting, Plaintiff learned that she would have her work written up by other family division judges' law clerks on a rotating weekly schedule and would not be permitted to question the work product received or speak to the clerks directly or have any direct contact. GQ Tr. at 235-236, 243-246 (Dohn Cert., Exh. A); 12/14/15 Notes (Ferrara Cert., Exh. D).

33.    During the meeting, as this new plan was being discussed, Defendant Laura Simoldoni reached into Plaintiff's purse, removed a recording device and refused to return it. Plaintiff's purse was tall and, although open, was positioned so that the recorder was not visible. GQ Tr. at 243 (Dohn Cert., Exh. A). When Simoldoni retrieved the device she did not know what it was. Moskal testified that she stated "What is this? What is this?" Moskal Dep. at 270, 275 (Ferrara Cert., Exh. B). Plaintiff later learned that a copy of the recording was made without her

consent or permission. After the meeting, Plaintiff returned to her chambers and was physically ill and had a severe continuous nosebleed for hours. GQ Tr. at 235-236, 243-246 (Dohn Cert., Exh. A); 12/14/15 Notes (Ferrara Cert., Exh. D).

34.    On December 23, 2015, an attorney hired by Plaintiff contacted Judge Mizdol to inform her of his representation and that Plaintiff would not be attending work the next day in order to see a doctor. The same day, Judge Mizdol made a false report to the Advisory Committee on Judicial Conduct ("ACJC"), stating that Plaintiff had willfully violated the Judiciary's internal employment policies by requiring the law clerk, Nadya Comas, to start early. Specifically, Judge Mizdol alleged to the ACJC that Plaintiff had received and violated a memo from the Administrative Director of the Courts prohibiting law clerks from working prior to August 24, 2015, knowing that Plaintiff could not have received the memo. When Judge Mizdol later received affirmative proof that Plaintiff had never received the memo, she failed to retract or correct her accusation to the ACJC. SAC ¶ 34.

35.    Plaintiff learned on January 3, 2016 that she was being involuntarily transferred to the Essex Vicinage effective January 11, 2016 as a result. GQ Tr. at 257 (Dohn Cert., Exh. A).

36.    In a telephone call that day when Plaintiff expressed how she was treated in Bergen County and how Judge Mizdol had cursed and berated her and

belittled her in front of staff, Judge Grant said "the Governor speaks to people that way.  Get over it."  GQ Tr. at 257:15-21 (Dohn Cert., Exh. A).

37.     On or after January 6, 2016, Judge Mizdol also called Judge Sallyanne Floria, the Assignment Judge of the Essex Vicinage, and stated, "Good luck!, you're getting a problem child," in an attempt to disparage Plaintiff and poison her new assignment.  GQ Tr. at 174-175 (Dohn Cert., Exh. A).

38.     Defendants' misconduct caused Plaintiff to suffer adverse employment consequences, severe emotional distress manifesting itself in ongoing physical symptoms such as sleeplessness, headaches, anxiety, migraines and nosebleeds and other damages.  SAC ¶ 38; GQ Tr. at 317 (Dohn Cert., Exh. A).

39.     Defendants' conduct further robbed Plaintiff of her reputation and the respect of her peers and the courthouse staff and legal community statewide.  SAC ¶ 39; GQ Tr. at 316-17 (Dohn Cert., Exh. A).

40.     The disciplinary proceeding against Plaintiff was initiated when Judge Mizdol filed the false grievance regarding solely the early start date of Plaintiff's law clerk to the ACJC.  SAC ¶ 34.

41.     This charge was ultimately found to be without merit.   While conducting its investigation, the ACJC added two additional charges.  The first charge involved Plaintiff's use of her judicial secretary to perform some personal tasks.  The ACJC ultimately found the use was *de minimus* and not a basis for

discipline.  The second charge stemmed from Plaintiff's recording of a meeting with Defendants Mizdol, Moskal and Simoldoni.  The ACJC ultimately found that this charge warranted discipline and suspended Plaintiff for two months without pay. Presentment (Dohn Cert., Exh. M).

Respectfully submitted,

Ferrara Law Group, PC
Attorneys for Plaintiff

Dated:  February 6, 2024

*/s/ Ralph P. Ferrara*_____
Ralph P. Ferrara
Kevin J. Kotch
