**KANG HAGGERTY LLC,**
Ralph P. Ferrara, Esquire (ID #024521985)
123 S. Broad Street, Suite G1950
Philadelphia, PA 19109
P: 215.525.5850
F: 215.525.5860
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DEBORAH GROSS-QUATRONE<br><br>Plaintiff<br><br>v.<br><br>BONNIE MIZDOL, DIANA MOSKAL, LAURA SIMOLDONI and JOHN and JANE DOE 1-10<br><br>Defendants | Case No. 2:17-cv-13111-SDW-LDW |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS**

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................... i

TABLE OF AUTHORITIES............................................................................... iii

STATEMENT OF FACTS AND PROCEDURAL HISTORY............................... 1

I.      Procedural History ..................................................................................... 1

II.     Factual Background .................................................................................... 1

III.    The New Jersey Judicial Disciplinary Proceeding...................................... 14

STANDARD OF REVIEW................................................................................ 15

I.      The Defendants Are Not Immune For Their Extra-ACJC Conduct............. 16

II.     Plaintiff Has Claims Under Both The Equal Protection Clause (42 U.S.C. § 1983) And The New Jersey Civil Rights Act ............................................... 17

III.    Defendants Violated Plaintiff's Fourth Amendment Rights........................ 22

        A.      The ACJC's Findings Of Fact Are Not Entitled To Preclusive Effect; The Third Circuit Has Held That Collateral Estoppel Does Not Apply To Bar The Fourth Amendment Claim................................................ 22

        B.      Plaintiff Had A Reasonable Expectation Of Privacy In The Contents Of Her Purse And The Actions Of Simoldoni And Mizdol Were Not Reasonable ....................................................................................... 26

        C.      Mizdol And Simoldoni Are Not Entitled To Qualified Immunity..... 29

IV.     Plaintiff Has A Claim Under NJLAD ......................................................... 31

        A.      Defendants Are Liable For Aiding And Abetting .............................. 31

        B.      Defendants Are Liable Under The NJLAD For The Reasons Set Forth Above .................................................................................... 32

CONCLUSION .................................................................................................. 33

# TABLE OF AUTHORITIES

## Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ........................................... 15

Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257 (3d Cir. 2001) ........ 18

Blakey v. Continental Airlines, 992 F. Supp. 731 (D.N.J. 1998) ........................... 21

Cochrance v. Qattrocchi, 949 F.2d 11 (1st Cir. 1991) ............................................ 30

Dennis v. Sparks, 449 U.S. 24 (1980) ..................................................................... 32

Doe v. City of Belleville, 119 F.3d 563 (7th Cir. 1997) ......................................... 19

Ellingsworth v. Hartford Fire Ins. Co., 247 F. Supp. 3d 546 (E.D. Pa. 2017) ........ 19

Faragher v. City of Boca Raton, 524 U.S. 775 (1998) ............................................ 18

Fraternal Order of Police, Lodge 1 v. City of Camden, 842 F.3d 232
    (3d Cir. 2016) ................................................................................... 15

Gillard v. Schmidt, 579 F.2d 825 (3d Cir.1978) ..................................................... 27

Gross-Quatrone v. Mizdol, No. 19-3231, 811 Fed. Appx. 95
    (3d Cir. Apr. 27, 2020) ................................................................... 23

Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) ............................................... 18

Howell v. Polk, 532 F.3d 1025 (9th Cir. 2008) ....................................................... 30

Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100 (3d Cir.2009) ..... 17

Katz v. United States, 389 U.S. 347 (1967) ............................................................ 27

Konopka v. Borough of Wyoming, 383 F. Supp. 2d 666 (M.D. Pa. 2005) ............ 29

Martinez v. California, 444 U.S. 277 (1980) ........................................................... 17

Morgan-Hicks v. New Jersey Dep't of Corrections, Civ. No. 17-655 (RMB-JS), 2020 WL 1983705 (D.N.J. Apr. 24, 2020) .................................................... 15

Murray-Sims v. New Jersey Transit Corp., 2014 WL 66991906 (D.N.J. Dec. 10, 2014) ................................................................. 15

Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656 (1989)................... 26

New Jersey v. T.L.O., 469 U.S. 325 (1985)............................................................ 27

Norton v. Praxair Distribution, Inc., Civ. A. No. 17-6897, 2019 WL 1569826 (D.N.J. Apr. 11, 2019) ................................................................. 31

O'Brien v. South Suburban College, 1994 WL 376282 (N.D. Ill. July 15, 1994)................................................................. 27, 28

O'Connor v. Ortega, 480 U.S. 709 (1987)............................................................. 27

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) ............................................. 19

Prowel v. Wise Business Forms, Inc., 579 F.3d 285 (3d Cir. 2009)....................... 19

Riley v. California, 134 S. Ct. 2473 (2014) .......................................................... 29

Rowan v. Hartford Plaza Ltd., No. A-0107-11T3, 2013 WL 1350095 (App. Div. Apr. 5, 2013) ................................................................. 31

Steele v. Cicchi, 855 F.3d 494 (3d Cir. 2017)........................................................ 15

Torres v. Puerto Rico, 442 U.S. 465 (1979)........................................................... 28

United States v. Turner, 839 F.3d 429 (5th Cir. 2016) .......................................... 29

Uwalaka v. State of New Jersey, No. Civ. 04-2973 (SRC), 2005 WL 3077685 (D.N.J. Nov. 15, 2005)............................................................. 31, 32

Villanueva v. Zimmer, 431 N.J. Super. 301 (App. Div. 2013)............................... 24

Winters v. N. Hudson Reg'l Fire & Rescue, 50 A.3d 649, 212 N.J. 67 (2012) ................................................................. 23, 25

Yobe v. Renaissance Elec., Inc., Civ. A. No. 15-3121, 2016 WL 614425
        (D.N.J. Feb. 16, 2016)................................................................... 31

Zelinski v. Pennsylvania State Police, 108 Fed. Appx. 700
        (3d Cir. Aug. 11, 2004)............................................................... 27

## **Statutes, Rules and Secondary Sources**

42 U.S.C. §1983 ............................................................................. 1, 17

42 U.S.C. §1985 ............................................................................. 1, 17

N.J.S.A. 10:5-1 ................................................................................... 1

N.J.S.A. 10:6-1 ................................................................................... 1

N.J.S.A. 10:6-2 ................................................................................... 1

R. 2:15-13 .......................................................................................... 24

R. 2:15-14 .......................................................................................... 24

R. 2:15-22 .................................................................................... 16, 17

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

I.    **Procedural History.**

Plaintiff filed a Second Amended Complaint ("SAC") against Defendants alleging causes of action for (1) violation of 42 U.S.C. §§ 1983 and 1985, (2) civil conspiracy, (3) New Jersey Civil Rights Act – N.J.S.A. 10:6-2(c), (4) New Jersey Law Against Discrimination – N.J.S.A. 10:5-1 et seq. After this Court dismissed the action, Plaintiff filed an appeal to the Third Circuit. The Third Circuit affirmed in part, vacated in part and remanded the matter finding that the "District Court correctly dismissed Gross-Quatrone's First Amendment, civil conspiracy, and 42 U.S.C. § 1985 claims but erred in dismissing her claims under the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-1, the New Jersey Laws Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1, the Equal Protection Clause, and the Fourth Amendment." Dohn Cert., Ex. Q. Defendants filed the instant motion for summary judgment seeking to dismiss the remaining claims.

II.    **Factual Background.**

Plaintiff became a New Jersey Superior Court Judge on March 3, 2015. GQ Tr. at 18:5 (Dohn Cert., Exh. A). Plaintiff was initially appointed to become a Judge in Bergen County. However, Plaintiff was immediately transferred to the Passaic Vicinage in Paterson, New Jersey as a result, in part, of Judge Mizdol's preference and her vote that Plaintiff not be assigned to the Bergen Vicinage despite her earlier

1

statements and positions to the contrary.  GQ Tr. at 25:24-26:23 (Dohn Cert., Exh. A).

Each of the defendants had a supervisory role over Plaintiff and used their positions to create a hostile work environment in order to "get rid" of Plaintiff.  Judge Mizdol was the Assignment Judge of the Bergen Vicinage.  Defendant Simoldoni was the Trial Court Administrator for the Bergen Vicinage.  Defendant Moskal was the Family Division Manager.

On June 23, 2015, Plaintiff was notified that she would be re-assigned to the Bergen Vicinage and was instructed to contact Judge Mizdol to make arrangements for her transfer.  GQ Tr. at 32:16-33:7 (Dohn Cert., Exh. A).  Plaintiff contacted Judge Mizdol by telephone on June 23, 2015 as instructed and learned the transfer would be effective July 6, 2015.  GQ Tr. at 37:1-39:1 (Dohn Cert., Exh. A).  During this telephone call, Plaintiff informed Judge Mizdol of her upcoming, pre-approved vacation time.  Id.  Judge Mizdol responded by yelling, "Jesus Christ, do you have any other fucking vacation that I don't know about?" and denied Plaintiff's request for additional time to pack her personal things.  Id.; GQ Tr. at 53:22-23 (Dohn Cert., Exh. A).

Plaintiff first reported to work in the Bergen Vicinage on July 6, 2015 at 8:00 a.m. for a meeting with Judge Mizdol, as instructed, in Judge Mizdol's chambers. GQ Tr. at 54:3-55:25 (Dohn Cert., Exh. A).  She was assigned to the Family

Division.   During this meeting, Judge Mizdol read a list of special rules and instructed her to follow those rules.  GQ Tr. at 55:24-56:17 (Dohn Cert., Exh. A). The rules included prohibitions against Plaintiff attending medical appointments during work hours, warnings about her hearing that Plaintiff was seen leaving the courthouse during work hours, and also that taking lunch was strongly discouraged. Id.  On the same day, Judge Christopher Kazlau was also transferred to the Bergen Vicinage and met with Judge Mizdol immediately following Plaintiff's meeting with her.  GQ Tr. at 57:1-5 (Dohn Cert., Exh. A).  Judge Mizdol met with Judge Kazlau at 8:30 am, which was normal business hours.  Id.  None of the rules Judge Mizdol imposed on Plaintiff were imposed on Judge Kazlau or even mentioned to him.  GQ Tr. at 57:7-9 (Dohn Cert., Exh. A).  Nor were they applied, upon information and belief, to any other judges in the Bergen Vicinage reporting to Judge Mizdol. Plaintiff was also assigned a parking space which was located immediately next to Judge Mizdol, which, upon information and belief, was assigned at Judge Mizdol's direction to permit her to monitor when Plaintiff arrived and left and to further intimidate her.   GQ Tr. at 66:23-67:12, 82:1-7 (Dohn Cert., Exh. A). Upon information and belief, no other new judges were assigned spaces on that side of the lot or on that floor of the parking garage entrance.

Judge Mizdol made Plaintiff explicitly aware that she was being closely watched.  Judge Mizdol would call Plaintiff's chambers every day at 8:25 am, 8:30

3

am and 1:30 pm to check that Plaintiff was there.  GQ Tr. at 92:16-93:18 (Dohn Cert., Exh. A).  Judge Mizdol called Plaintiff's chambers at 1:30 p.m. and then, when the phone went unanswered, sent an e-mail stating, "tried to call your chambers- no voicemail picked up.  Can you give me a call?"  When Plaintiff returned her call shortly thereafter and informed Judge Mizdol that she had been at lunch, Judge Mizdol reminded Plaintiff of her rule that taking lunch was discouraged. Plaintiff also explained to Judge Mizdol that she believed the voicemail was not working, which turned out to be the case.  GQ Tr. at 93:1-18 (Dohn Cert., Exh. A).  Plaintiff was also required to send her daily calendar to Judge Mizdol by 3 p.m. each day. Second Amended Complaint ("SAC") ¶ 25 (Dohn Cert., Exh. P); Notes 7/6/15 (Ferrara Cert., Exh. D).

On or about August 6, 2015, Judge Quatrone's law clerk, Nadya Comas, appeared at her chambers for her first day of what Judge Quatrone understood to be permissible transition.  Judge Quatrone made no effort to hide her law clerk's presence and the law clerk was instructed to report to the Bergen Vicinage human resources department to arrange for a parking pass and to otherwise complete the intake process.  SAC ¶ 19; Notes 8/4/15 (Ferrara Cert., Exh. D).  Plaintiff was in a shared chambers with another judge (Judge Jane Gallina-Mecca) and her staff. Plaintiff and Judge Mecca's law clerk shared a common desk.

In late August or early September of 2015, Plaintiff was summoned to a

4

meeting with Judge Mizdol in her chambers. Judge Mizdol expressed that some of the courthouse staff had complained about Plaintiff's demeanor. Plaintiff expressed surprise and inquired as to exactly what complaints Judge Mizdol was referring to. Judge Mizdol did not provide specifics as to who complained. Plaintiff offered to resign and in response Judge Mizdol stated, "you come here with your fancy clothes and bare legs" and you expect me to believe this? Judge Mizdol then also implied that Plaintiff couldn't handle the job. GQ Tr. at 117:17-118:25 (Dohn Cert., Exh. A). In a separate interaction with Judge Mizdol in the summer of 2015, Judge Mizdol stated to Plaintiff that she "laughs when I see you with your beach hair and flip-flops." Plaintiff never wore flip-flops during work hours, but did wear them while walking into the Courthouse due to the construction in the parking area. GQ Tr. at 114:2-115:20 (Dohn Cert., Exh. A).

In September of 2015, Plaintiff learned that courthouse staff were freely calling her "The Diva Judge" and commenting about her "fancy clothes and a big ring." GQ Tr. at 107:8-23 (Dohn Cert., Exh. A); Moskal Dep. at 285-297 (Ferrara Cert., Exh. B). This allegation supports the reasonable inference that the court house staff felt that they could insult a sitting judge with name calling impunity, which could only come from Judge Mizdol. Defendant Diana Moskal said she was working with Judge Mizdol and Ms. Simoldoni on "getting rid of Judge Gross-Quatrone." Little Tr. at 32 (Ferrara Cert., Exh. C). Defendant Moskal, however, did admit that

5

there was talk about her nice clothes, the way she carried herself, and her jewelry. Moskal Tr. at 285-297 (Ferrara Cert., Exh. B). Moskal said there was talk of a Diva at a team leaders and assistant managers meeting. Moskal Tr. at 287:25-288:11 (Ferrara Cert., Exh. B). Ro Cuccio said that Moskal had called Plaintiff "Judge Diva" at Team Leaders meeting. GQ Tr. at 112:22-113:3 (Dohn Cert., Exh. A). Karen Francis said that Moskal called Plaintiff a bimbo. Moskal Tr. at 297 (Ferrara Cert., Exh. B).[1] At another meeting, Kathy Palmer, when speaking about Plaintiff, said "The bitch won't give me the files." GQ Tr. at 87:6-19 (Dohn Cert., Exh. A) This talk served to undermine Plaintiff within the Family Division

Moskal informed staff to go into Plaintiff's chambers, look around and listen. Then they were instructed by Moskal to report back so that they could get rid of Plaintiff. Little Tr. at 27-28 (Ferrara Cert., Exh. C). She would report back to Mizdol. Id.

On September 3, 2015, Judge Mizdol once again summoned Plaintiff to her chambers. Upon arrival, Judge Mizdol and Defendant Laura Simoldoni were present. At this meeting, Judge Mizdol was irate and abusive to Plaintiff. She repeatedly yelled and screamed at Plaintiff in front of Defendant Laura Simoldoni. Among other things, she yelled that Plaintiff was "putting the judiciary at risk of a

---

[1] Diana Moskal lived with a female partner and was not heterosexual. GQ Tr. at 286 (Dohn Cert., Exh. A).

6

lawsuit" by statements Plaintiff allegedly made to another courthouse employee, Jessica Mulligan.  GQ Tr. at 160 (Dohn Cert., Exh. A).  Judge Mizdol also stated, "I don't know what kind of pedestal they (referring to the male judges Plaintiff worked with and socialized with in Passaic) put you on, but I'm going to knock you off." GQ Tr. at 27-28, 152 (Dohn Cert., Exh. A).  Plaintiff insisted that she had said nothing inappropriate or actionable to Ms. Mulligan and told Judge Mizdol that she should confirm with Plaintiff's secretary, Maria DeLeon, who was present for the subject conversation with Ms. Mulligan, that she said nothing inappropriate or actionable.  GQ Tr. at 136 (Dohn Cert., Exh. A).  Judge Mizdol then ordered Simoldoni to call Ms. DeLeon to her chambers and, in the presence of Defendant Laura Simoldoni and Plaintiff, immediately asked her if Plaintiff had ever yelled at her.  GQ Tr. at 134 (Dohn Cert., Exh. A).  Plaintiff and Ms. DeLeon were confused and stunned by Judge Mizdol's volume and anger, and Ms. DeLeon glanced at Plaintiff for a moment.  As soon as this happened, Judge Mizdol yelled at Ms. DeLeon, "don't look at Judge Gross-Quatrone, you look at me!  This is very serious and I need you to tell the truth" implying that Ms. DeLeon was going to lie before she even spoke.  GQ Tr. at 133-135 (Dohn Cert., Exh. A).  Ms. DeLeon then informed Judge Mizdol that Plaintiff never raised her voice or yelled at anyone, including herself.  Plaintiff returned to her chambers and was physically ill and had a nosebleed.

On September 28, 2015, Plaintiff's secretary received a call from a courthouse staff member asking if the Plaintiff would take a case, since Judge Mizdol believed that Plaintiff had no cases on her calendar.  GQ Tr. at 177-182 (Dohn Cert., Exh. A). Plaintiff's secretary tried to explain that Plaintiff had just received a case and was reviewing the file, but she would ask the Plaintiff to take the new case.  Id. The staff member replied that she would call another Judge to take the new case.  Id. Plaintiff's secretary explained what had occurred to the Plaintiff and Plaintiff was immediately concerned that she would be yelled at again by Judge Mizdol and accused of refusing a case. Id.  Plaintiff immediately attempted to call her Presiding Judge, Peter Melchionne, but was advised by his secretary Theresa Schenck that he was on the bench. Id.  Plaintiff explained the scenario to Ms. Schenck who replied, "don't worry its fine, I will let him know." Id. at 181.  No sooner did Plaintiff hang up the phone, when Judge Mizdol barged into Plaintiff's chambers and yelled, in the presence of Plaintiff's secretary and court clerk, "You are not on the record!", "What the fuck is going on here?", "Who are you to refuse a case?" belittling and demeaning Plaintiff if the presence of her staff.  Id. at 181.  Judge Mizdol was abusive and angry towards Plaintiff and remained in Plaintiff's chambers for approximately forty-five minutes.  Id. at 182. Judge Mizdol spent this time alleging that Plaintiff had refused to hear a case and would not accept Plaintiff's simple and direct explanation as to how that was untrue.  Id. at 181-183.

8

On October 1, 2015, Plaintiff was called into a meeting at 8:30 a.m. with Judge Melchionne to discuss a new internal judiciary report concerning outstanding motions. At the meeting, Plaintiff received a copy of the new report.   Judge Melchionne advised Plaintiff that it appeared she had not submitted any updates for any of her motions for the prior six weeks, so he had no idea what was going on with her motions.   Plaintiff advised Judge Melchionne that there must have been some mistake because her secretary had given a marked-up motion calendar to the appropriate staff member after each motion cycle and all motions were completed. Judge Melchionne also handed Plaintiff a copy of an order from a case she decided on September 29, 2015, with his own handwritten notes on it stating that the order was horrible.   Plaintiff was visibly upset and apologized.   Plaintiff could not understand how Judge Melchionne had this order in his possession so quickly, as it had just been entered and the files had only been returned less than twenty-four hours before this meeting. After the meeting, Plaintiff inquired with her motion team regarding how her motion list could have not been updated.   Her team leader advised that she had received the marked up motion calendar from Plaintiff's secretary, but the information was not entered into the computer system, making it appear as though Plaintiff was not doing her job.   GQ Tr. at 188-191 (Dohn Cert., Exh. A); Notes 10/1/15 (Ferrara Cert. Exh. D).

Sometime between October and December 2015, Judge Mizdol and/or Diana

Moskal issued a directive that no courthouse staff were permitted to enter Plaintiff's chambers alone, further damaging the Plaintiff's reputation and causing a more hostile environment for Plaintiff and increased disparaging comments being made about the Plaintiff. Little Tr. at 28 (Ferrara Cert., Exh. C); GQ Tr. at 188-189 (Dohn Cert., Exh. A).

On December 2, 2015, Plaintiff attended a mandatory all judges' lunch meeting.  After the meeting, Laura Simoldoni told Plaintiff that Judge Mizdol wanted to see her. Judge Mizdol was waving a piece of paper in the air and began screaming at Plaintiff, "read this!" Plaintiff read it, and Judge Mizdol screamed, "read it again, this is actionable!" Judge Mizdol was waiving and referring to an e-mail Plaintiff had sent to her law clerk on November 30, 2015, inquiring as to the subject of an unscheduled meeting the law clerk had attended with Defendant, Diana Moskal. After the meeting, Plaintiff returned to her chambers and had a severe nosebleed. GQ Tr. at 100:1-4. 197:24-200:4, 206:1-4 (Dohn Cert., Exh. A); Notes (Ferrara Cert., Exh. D).

On December 10, 2015, Defendant Laura Simoldoni appeared at Plaintiff's chambers at 5:30 p.m. and, in the presence of Plaintiff's husband, advised Plaintiff that "Nadya [Comas] is in a bad way."  Plaintiff asked, "what does that mean?" Defendant Laura Simoldoni responded, "yeah Judge, it's not going to work out and she's not going to be working for you." The Plaintiff then asked Ms. Simoldoni,

"who will complete the work for the cases scheduled for tomorrow?" Ms. Simoldoni told Plaintiff's secretary that she should complete the law clerk's work and have the files ready for the hearings the following day. Plaintiff's secretary stayed at work until almost 7:00 p.m., trying to prepare the files for the following day that were not completed and was forced to take the files home with her to work on them. Plaintiff had a nosebleed at that point in the presence of her husband and secretary. Ms. Simoldoni did not state to Plaintiff that the law clerk had alleged that Plaintiff had created a hostile working environment. She also failed to mention any concern over the law clerk's start date of August 6, 2015. GQ Tr. at 214:5-215:6 (Dohn Cert., Exh. A); Notes (Ferrara Cert., Exh. D)

On December 11, 2015, Ms. Simoldoni wrote Judge Mizdol a memo claiming that Ms. Comas had alleged that Plaintiff had created a "hostile working environment," and had required her to start working three weeks before her "official start date." The memo concluded that Plaintiff's behavior towards the law clerk was "completely inappropriate." December 11, 2015 Memo (Ferrara Cert., Exh. E).

On December 14, 2015, Plaintiff was summoned to another meeting in Judge Mizdol's chambers. Plaintiff explained to Judge Mizdol that she had recently confronted the law clerk with a lie the law clerk had told on December 3, 2015, and that being caught lying was probably the true impetus for the law clerk fabricating allegations of a hostile working environment. Judge Mizdol responded by yelling

11

that Plaintiff's husband should not have been present in chambers, and that the law clerk would not be returning to her. Plaintiff was concerned about the workload without a law clerk and asked if a new law clerk would be hired. Judge Mizdol told Plaintiff, "there's no money in the budget for a new law clerk. You won't have one for 8-9 months." Notes 12/14/15 (Ferrara Cert., Exh. D).

On December 21, 2015, Plaintiff attended a meeting with Judge Mizdol that later included Laura Simoldoni, Diana Moskal and Judge Peter Melchionne. The meeting was demanded by Judge Mizdol to advise Plaintiff of what arrangements would be made since Ms. Comas would not be replaced. Plaintiff was recording the meeting with a digital recording device she had in her pocketbook which was placed next to her on the floor. During the meeting, while the Plaintiff was alone with Judge Mizdol, Judge Mizdol stated that she was trying to prevent an "ACJC complaint" from being filed against Plaintiff concerning Nadya Comas. At the meeting, Plaintiff learned that she would have her work written up by other family division judges' law clerks on a rotating weekly schedule and would not be permitted to question the work product received or speak to the clerks directly or have any direct contact. During the meeting, as this new plan was being discussed, Defendant Laura Simoldoni reached into Plaintiff's purse, removed a recording device and refused to return it. Plaintiff's purse was tall and, although open, was positioned so that the recorder was not visible. GQ Tr. at 243 (Dohn Cert., Exh. A). When Simoldoni

12

retrieved the device she did not know what it was.  Moskal testified that she stated "What is this?  What is this?"  Moskal Dep. at 270, 275 (Ferrara Cert., Exh. B).  Plaintiff later learned that a copy of the recording was made without her consent or permission.  After the meeting, Plaintiff returned to her chambers and was physically ill and had a severe continuous nosebleed for hours.  GQ Tr. at 235-236, 243-246 (Dohn Cert., Exh. A); 12/14/15 Notes (Ferrara Cert., Exh. D).

On December 23, 2015, an attorney hired by Plaintiff contacted Judge Mizdol to inform her of his representation and that Plaintiff would not be attending work the next day in order to see a doctor.  The same day, Judge Mizdol made a false report to the Advisory Committee on Judicial Conduct ("ACJC"), stating that Plaintiff had willfully violated the Judiciary's internal employment policies by requiring the law clerk, Nadya Comas, to start early.  Specifically, Judge Mizdol alleged to the ACJC that Plaintiff had received and violated a memo from the Administrative Director of the Courts prohibiting law clerks from working prior to August 24, 2015, knowing that Plaintiff could not have received the memo.  When Judge Mizdol later received affirmative proof that Plaintiff had never received the memo, she failed to retract or correct her accusation to the ACJC.  SAC ¶ 34.

Plaintiff learned on January 3, 2016 that she was being involuntarily transferred to the Essex Vicinage effective January 11, 2016 as a result.  GQ Tr. at 257 (Dohn Cert., Exh. A).  In a telephone call that day when Plaintiff expressed how

13

she was treated in Bergen County and how Judge Mizdol had cursed and berated her and belittled her in front of staff, Judge Grant said "the Governor speaks to people that way.  Get over it."  GQ Tr. at 257:15-21 (Dohn Cert., Exh. A).On or after January 6, 2016, Judge Mizdol also called Judge Sallyanne Floria, the Assignment Judge of the Essex Vicinage, and stated, "Good luck!, you're getting a problem child," in an attempt to disparage Plaintiff and poison her new assignment.  GQ Tr. at 174-175 (Dohn Cert., Exh. A).

Defendants' misconduct caused Plaintiff to suffer adverse employment consequences, severe emotional distress manifesting itself in ongoing physical symptoms such as sleeplessness, headaches, anxiety, migraines and nosebleeds and other damages.  SAC ¶ 38; GQ Tr. at 317 (Dohn Cert., Exh. A).  Defendants' conduct further robbed Plaintiff of her reputation and the respect of her peers and the courthouse staff and legal community statewide.  SAC ¶ 39; GQ Tr. at 316-17 (Dohn Cert., Exh. A).

### III.    The New Jersey Judicial Disciplinary Proceeding.

The disciplinary proceeding against Plaintiff was initiated when Judge Mizdol filed the false grievance regarding solely the early start date of Plaintiff's law clerk to the ACJC.  SAC ¶ 34.  This charge was ultimately found to be without merit. While conducting its investigation, the ACJC added two additional charges.  The first charge involved Plaintiff's use of her judicial secretary to perform some

personal tasks.  The ACJC ultimately found the use was *de minimus* and not a basis for discipline.  The second charge stemmed from Plaintiff's recording of a meeting with Defendants Mizdol, Moskal and Simoldoni.  The ACJC ultimately found that this charge warranted discipline and suspended Plaintiff for two months without pay.

## STANDARD OF REVIEW

Summary judgment is only appropriate if there are no genuine issues as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Disputes are genuine when a reasonable factfinder could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Courts must "review the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  Steele v. Cicchi, 855 F.3d 494, 500 (3d Cir. 2017).  In this Circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial.  Fraternal Order of Police, Lodge 1 v. City of Camden, 842 F.3d 232, 238 (3d Cir. 2016); Morgan-Hicks v. New Jersey Dep't of Corrections, Civ. No. 17-655 (RMB-JS), 2020 WL 1983705, at *4 (D.N.J. Apr. 24, 2020); see Murray-Sims v. New Jersey Transit Corp., 2014 WL 66991906, at *11 (D.N.J. Dec. 10, 2014) ("If a purported fact is based solely on a statement that constitutes hearsay and would not be admissible at trial, a court should not consider that statement in the context of a summary judgment motion.") (emphasis added).

15

## I.   **<u>The Defendants Are Not Immune For Their Extra-ACJC Conduct.</u>**

R. 2:15-22(b) of the Rule Governing the Courts of the State of New Jersey provides immunity for claims based on the act of communicating with the ACJC or the act of giving testimony.  Defendants do not argue that any particular claim must be dismissed based on this Rule; Defendants argue that certain facts cannot support any claim.  Testimony before the ACJC does not insulate a party from their liability about matters that occurred outside of the ACJC.  The liability is not based on the act of communicating to the ACJC, but on the underlying acts taken.

The only Defendant alleged to have made a complaint to the ACJC is Judge Mizdol.  The liability of the other Defendants is not based on the fact that they testified before the ACJC.  Moskal did not testify before the ACJC.  And the Rule makes clear that there is no immunity for any statements made outside of the ACJC proceeding, including statements about the subject matter of that proceeding.  When quoting from the Rule, Defendants omitted the last sentence which makes clear that publication of the information outside of the ACJC is not protected.  N.J. Ct. R. 2:15-22(b) provides:

> Witnesses and persons who bring to the Committee allegations concerning a judge shall be absolutely immune from suit, whether legal or equitable in nature, for all communications to the Committee or to its staff and for any testimony given at proceedings before the Committee, a three-judge panel, or the Supreme Court. <u>This immunity shall not extend to any other publication or communication of such information</u>.

Further, the State of New Jersey does not have the power to grant Defendants immunity from liability for violating Plaintiff's federal rights, as alleged in the First Count of the Amended Complaint. See Martinez v. California, 444 U.S. 277, 284 n.4 (1980) (holding that "[c]onduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced."). Thus, R. 2:15-22(b) is inapplicable to Plaintiff's claims under 42 U.S.C. § 1983.

## II. Plaintiff Has Claims Under Both The Equal Protection Clause (42 U.S.C. § 1983) And The New Jersey Civil Rights Act.

Plaintiff has a claim under both the Equal Protection clause (42 U.S.C. § 1983) and the New Jersey Civil Rights Act. To establish a prima facie hostile work environment claim, a plaintiff must show "(1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir.2009) (internal citations and quotation marks omitted). Title VII is violated "[w]hen the workplace is permeated with

17

discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to ... create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted). The court must determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of discriminatory conduct; its severity; whether it is physically humiliating and whether it interferes with an employee's work performance. Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998).

In Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257 (3d Cir. 2001), the Third Circuit made clear that there were multiple ways in which a plaintiff could prove same-sex discrimination. Although it listed three, "[b]ased on the facts of a particular case and the creativity of the parties, other ways in which to prove that harassment occurred because of sex may be available." Id. at 264.

> There are at least three ways by which a plaintiff alleging same-sex sexual harassment might demonstrate that the harassment amounted to discrimination because of sex – the harasser was motivated by sexual desire, the harasser was expressing a general hostility to the presence of one sex in the workplace, or the harasser was acting to punish the victim's noncompliance with gender stereotypes.

Id. at 264.

Discrimination based on her femininity is protected under the equal protection clause. Here, Plaintiff was discriminated upon based on, among other things, her appearance, her dress, her hair and jewelry. This was more than sufficient. For

18

example, in <u>Doe v. City of Belleville</u>, 119 F.3d 563, 581 (7th Cir. 1997), discrimination against a sixteen-year old young man was motivated by his co-workers' belief that because he wore an earring he was not sufficiently masculine, and there was sufficient evidence to support a finding that the harassment amounted to discrimination because of sex.    In <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989), a woman was advised that if she wished to enhance her chances at partnership, she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." <u>Id</u>. at 235; <u>see</u> <u>Prowel v. Wise Business Forms, Inc.</u>, 579 F.3d 285, 290 (3d Cir. 2009) (discrimination against women for failing to conform to a traditionally feminine demeanor and appearance); <u>Ellingsworth v. Hartford Fire Ins. Co.</u>, 247 F. Supp. 3d 546, 553 (E.D. Pa. 2017) (woman alleged harassment because of her masculine tattoo, how she dressed, how she looked and how she presented herself as a woman). Defendants had a view of how a female judge should present herself, and it wasn't like Gross-Quatrone.

Discrimination is based on the totality of the circumstances.  And not those circumstances viewed in isolation.  Defendant Mizdol commented on her hair and her flip flops.  Plaintiff learned that courthouse staff were freely calling her "The Diva Judge" and commenting about her "fancy clothes and a big ring."  GQ Tr. at 107:8-23 (Dohn Cert., Exh. A); Moskal Dep. at 285-297 (Ferrara Cert., Exh. B).

19

This allegation supports the reasonable inference that the court house staff felt that they could insult a sitting judge with name calling impunity, which could only come from Judge Mizdol. Defendant Diana Moskal said she was working with Judge Mizdol and Ms. Simoldoni on "getting rid of Judge Gross-Quatrone." Little Tr. at 32 (Ferrara Cert., Exh. C). Defendant Moskal, however, did admit that there was talk about her nice clothes, the way she carried herself, and her jewelry. Moskal Tr. at 285-297 (Ferrara Cert., Exh. B). Moskal said there was talk of Plaintiff as a Diva at a team leaders and assistant managers meeting. Moskal Tr. at 287:25-288:11 (Ferrara Cert., Exh. B). Ro Cuccio said that Moskal had called Plaintiff "Judge Diva" at Team Leaders meeting. GQ Tr. at 112:22-113:3 (Dohn Cert., Exh. A). In fact, Moskal had said it in a team meeting that the Diva Judge was returning from Passaic. GQ Tr. at 84:21-23 (Dohn Cert., Exh. A). Karen Francis said that Moskal called Plaintiff a bimbo. Moskal Tr. at 297 (Ferrara Cert., Exh. B). At another meeting, Kathy Palmer, when speaking about Plaintiff, said "The bitch won't give me the files." GQ Tr. at 87:6-19 (Dohn Cert., Exh. A) This talk served to undermine Plaintiff within the Family Division. None of the Defendants did anything to stop it.

Mizdol greeted Plaintiff back to Bergen County by exclaiming is there any other fucking vacation I'm not aware of. Mizdol then gave her a bunch of rules which only applied to her. She said she would knock Plaintiff off of the pedestal they had put her on in Passaic. She assigned Plaintiff a parking spot next to her and

frequently checked in on her at the beginning, middle (lunch time) or end of the day. Every opportunity that she could think of she yelled and berated her. Even assuming arguendo that the allegations against Plaintiff were true, she was a new judge. There was no grace period. Mizdol yelled at Plaintiff, while she gave male judges a stern talking to. Mizdol Tr. at 82-85.

Defendant Mizdol was aided in her desire to "get rid" of Plaintiff by Moskal and Simoldoni. Moskal informed staff to go into Plaintiff's chambers, look around and listen. Then they were instructed by Moskal to report back so that they could get rid of Plaintiff. Little Tr. at 27-28 (Ferrara Cert., Exh. C). She would report back to Mizdol. Id. Moskal was the Family Division manager; she and Mizdol set the tone. Simoldoni participated by removing Plaintiff's law clerk and then failing to provide a new one. She illegally rifled through Plaintiff's purse at the December 2015 meeting to locate a recorder. Neither Moskal or Simoldoni ever chastised others from disparaging Plaintiff. Mozkal and Simoldoni were *de facto* supervisory employees.

Defendant Mizdol also argues that Plaintiff suffered no adverse employment action, so she cannot recover. Plaintiff need only prove that it detrimentally affected her. Plaintiff was called the Diva judge. Comments were made about her hair, her bare legs, her jewelry, all in a demeaning way. Plaintiff was constantly berated, yelled at and cursed to to the point of suffering physical illness, including nose

21

bleeds, spitting up blood and headaches.    See Blakey v. Continental Airlines, 992 F. Supp. 731 (D.N.J. 1998).    Plaintiff's law clerk was taken away from her. Increasing her workload to a breaking point.  And finally she was transferred to a vicinage farther from her home.  Even if Plaintiff were required to show an adverse employment action, they have.

Plaintiff has provided evidence that all of these actions were taken as a result of her feminine qualities.  They didn't like the way she carried herself, her beachy hair, her flip flops, her bare legs and jewelry.  It didn't fit with how they thought a female judge should look and act.  When coupled with the use of "Judge Diva", "Diva", bitch and bimbo (all things one would associate with a woman), you are left with the conclusion that her feminine qualities motivated what happened here. Indeed, Moskal commented about the Judge Diva returning to Bergen before she got there.

**III.    Defendants Violated Plaintiff's Fourth Amendment Rights.**

**A.    The ACJC's Findings Of Fact Are Not Entitled To Preclusive Effect; The Third Circuit Has Held That Collateral Estoppel Does Not Apply To Bar The Fourth Amendment Claim.**

The Third Circuit has already held that the ACJC did not bar Plaintiff's

Fourth Amendment claim:

> The ACJC also made no findings as to Gross-Quatrone's First and Fourth Amendment claims.  Those claims arise out of Simoldoni's seizure of Gross-Quatrone's audio-recording device and copying of the recording.  Although facts relating to the audio-recording incident were

discussed in the ACJC's decision, the ACJC made not conclusion about whether Simoldoni's actions violated the First or Fourth Amendments. Accordingly, the ACJC's ruling did not bar these claims.

Gross-Quatrone v. Mizdol, No. 19-3231, 811 Fed. Appx. 95, 98 (3d Cir. Apr. 27, 2020). The question remains whether those "facts" may be used against Plaintiff. They may not.

This matter is a far cry from Winters v. N. Hudson Reg'l Fire & Rescue, 50 A.3d 649, 212 N.J. 67, 85 (2012). In Winters, the plaintiff countered the Civil Service Commission disciplinary proceeding by raising a retaliation defense in early stages that he had been retaliated against and was given a full opportunity to prove retaliation. He was found to have been properly terminated. Later, he filed a federal complaint alleging a violation for retaliation under the Conscientious Employee Protection Act (CEPA). The court found this claim was collaterally estopped, even if the firefighter had not fully litigated the retaliation defense before the Commission. Here, Gross-Quatrone raises a Fourth Amendment claim. The prior disciplinary proceeding focused on her failure to abide by the instructions of a superior and her lying about it. The court would have disciplined her, whether or not the seizure of the recording device violated the Fourth Amendment. It had nothing to do with it.

Moreover, any "facts" determined by the ACJC are not binding given the difference in focus between this case and that proceeding and the ACJC's limited

23

task to determine violations of the judicial code.  See Villanueva v. Zimmer, 431 N.J. Super. 301, 318-10 (App. Div. 2013) (SSA disability determinations not admissible in personal injury action). The disciplinary proceeding is much different from the instant case.  The proceeding focused on whether Plaintiff violated any of the Rules of Judicial Conduct.  Plaintiff had no ability to bring any of the affirmative claims asserted here in that proceeding.  Plaintiff's discovery was limited to what was in the ACJC's files.  R. 2:15-13(a).  Plaintiff could not take any depositions or serve additional requests.  While the hearings are supposed to be recorded and the Judge provided a copy of the transcript (R. 2:15-14(c)), in this case, the vast majority of Plaintiff's testimony, and only Plaintiff's testimony, was never recorded and therefore, transcripts were not available for the ACJC's consideration or the Supreme Court's consideration on Plaintiff's challenge.  Plaintiff was limited in the witnesses she could present, and the ACJC was not bound by the Rules of Evidence. R. 2:15-14(e).  While Plaintiff did seek to explain her conduct based on the existing workplace environment, this was not a formal, established defense.  As set forth below, the ACJC did not make any ruling on whether there was in fact a hostile workplace or whether Defendants had violated any Plaintiff's constitutional rights. And the ACJC certainly did not make any rulings on the viability of Plaintiff's claims against Defendants; the issue was not before the ACJC.

A review of the elements of collateral estoppel reveal that this argument is frivolous. In order to determine if relitigating an issue in a subsequent action is precluded, the court must find that: "(1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding." Winter, 212 N.J. at 85.

The issue decided is not the same issue to be decided by this Court. The disciplinary proceeding decided whether Plaintiff violated the Canons of Judicial Ethics. The proceeding was deciding whether Plaintiff had defied her superior and exhibited a lack of candor without regard for the integrity of the judicial office. The disciplinary panel made no finding about whether Defendant Simoldoni's view of a red light and then reaching in Plaintiff's purse a retrieve, as was later determined, a recorder. There was absolutely no finding about whether that violated the Fourth Amendment.

The Fourth Amendment issue was not actually litigated in the disciplinary proceeding. It was irrelevant to the disciplinary board whether or not the seizure of the recording device violated the Fourth Amendment. They were concerned only if

Plaintiff ignored the order of her superior that the meeting not be recorded and whether she lied about recording the meeting.

On the third element, the disciplinary board did not issue a final judgment on the Fourth Amendment issue.

On the fourth element, a determination of whether the Fourth Amendment was "essential" to the prior judgment. The disciplinary board would have reached the same result whether or not Defendant Simoldoni violated the Fourth Amendment.

### B.   Plaintiff Had A Reasonable Expectation Of Privacy In The Contents Of Her Purse And The Actions Of Simoldoni And Mizdol Were Not Reasonable.

Plaintiff alleges Defendant Simoldoni violated her Fourth Amendment rights when she unlawfully seized Plaintiff's recorder. See, e.g., Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656 (1989) (finding it "settled that the Fourth Amendment protects individuals from unreasonable searches conducted by the Government, even where the Government acts as an employer."). Plaintiff also alleges the Fourth Amendment violation was furthered when, at the instigation of Mizdol, they copied and played the recording.

When Simoldoni reached in Plaintiff's purse, she was acting under color of state law. There is no question that Simoldoni was a state actor; she was the Trial Court Administrator for Bergen County. This is a search and seizure claim. It is irrelevant whether or not Simoldoni was a supervisor. She was at the meeting in her

capacity as HR investigator. The lone case cited by defendants is <u>Zelinski v. Pennsylvania State Police</u>, 108 Fed. Appx. 700, 703 (3d Cir. Aug. 11, 2004), which was a hostile work environment case.

The search of an employee's pursue is actionable. For example, in <u>O'Brien v. South Suburban College</u>, 1994 WL 376282 (N.D. Ill. July 15, 1994), the court found that the search of an employee's purse could give rise to a cause of action under § 1983:

> [T]his court finds that Count III sufficiently alleges a violation of § 1983. By alleging that Zortman searched O'Brien's purse as library director, Count III sufficiently alleges that Zortman was a public employee acting under color of state law. The court also holds that O'Brien has alleged a deprivation of her Fourth Amendment right against unreasonable searches and seizures. The Fourth Amendment applies to government searches that intrude upon an individual's legitimate expectation of privacy. <u>Katz v. United States</u>, 389 U.S. 347, 361 (1967). The Fourth Amendment's protections extend beyond the circumstance in which an individual is suspected of criminal behavior. <u>New Jersey v. T.L.O.</u>, 469 U.S. 325, 335 (1985). In <u>O'Connor v. Ortega</u>, 480 U.S. 709 (1987), a plurality of the United States Supreme Court held that a government employee had a legitimate expectation of privacy in his office desk and file cabinets. <u>Id</u>. at 719 (plurality opinion); <u>see also</u> <u>Gillard v. Schmidt</u>, 579 F.2d 825, 827–28 (3d Cir.1978) (holding that school employee had legitimate expectation of privacy in his workplace desk, which school board member had searched for evidence that the employee had drawn an anonymous newspaper cartoon ridiculing the school board).

<u>Id</u>. at *5; <u>see</u> <u>New Jersey v. T.L.O.</u>, 469 U.S. 325, 337 (1985) (student had protectible Fourth Amendment right against school official's unreasonable search of her purse for evidence that she violated school's regulations against smoking). The court went

on to recognize the reasonable expectation of privacy that a person has with the contents of their purse:

> A purse generally contains private property and personal items and effects, and generally is for the employee's exclusive use. Items of such a personal nature cannot be said to be subject to random searches by the employer without some sort of prior notice to the employee that searches of personal property were part of the rules of the workplace.

Id.

Defendants' argument that Defendants were free to reach into Plaintiff's purse because the recorder was in "plain view" is meritless. Defendant Simoldoni stated that she saw a red beaming light. She did not know what it was. The light could have come from anything. Indeed, her co-defendant Mozkal said that Simoldoni exclaimed, "What is this? What is this?", when she pulled the recorder from the purse, indicating that she did not know what it was. Mozkal Tr. at 270, 275 (Ferrara Cert., Exh. B). Simply seeing a light does not give someone license to reach into a purse. And Simoldoni was not a law enforcement officer. She was a court administrator with no arguable authority to dig into Plaintiff's purse. See Torres v. Puerto Rico, 442 U.S. 465, 471 (1979) ("the grounds for a search must satisfy objective standards which ensure that the invasion of personal privacy is justified by legitimate governmental interests"). If Defendants' "plain view" argument were credited, there would be no expectation of privacy in the contents of one's purse

unless the purse is entirely sealed shut.  This is contrary to the reasonable expectation of privacy with the contents of one's purse.

Defendants further violated Plaintiff's Fourth Amendment rights by listening to and copying the entire contents of Plaintiff's digital voice recorder, including things unrelated to the meeting.  See Riley v. California, 134 S. Ct. 2473, 2491 (2014) (individual has reasonable expectation of privacy in the digital contents of his phone); United States v. Turner, 839 F.3d 429, 434 (5th Cir. 2016) (recognized privacy interest in the electronic contents of computers and cell phones); Konopka v. Borough of Wyoming, 383 F. Supp. 2d 666, 681 (M.D. Pa. 2005) (listing to the contents of the audio tape may constitute a search).  Plaintiff had a reasonable expectation that the recording would remain private.

### C.   **Mizdol And Simoldoni Are Not Entitled To Qualified Immunity**.

Defendant Simoldoni's act in reaching into Plaintiff's purse and then playing and copying the contents of the recorder are not entitled to qualified immunity.  See Konopka v. Borough of Wyoming, 383 F. Supp. 2d 666, 681 (M.D. Pa. 2005) (there was no qualified immunity from claim that opening the desk drawer and listening to tape was a Fourth Amendment violation).  As the court noted in Konopka, "[a] reasonable official simply cannot argue that he was unaware of the Fourth Amendment's proscription of searches that defeat an individual's reasonable expectation of privacy absent a warrant, exigent circumstances, or some other

29

exception."    Simply because Defendant Simoldoni saw a beaming red light in plaintiff's purse would not have given a reasonable person the belief that they were free to dig into another's purse.    Moreover, issues regarding reasonableness, including the reasonableness of a particular search or intrusion, are questions usually left for the factfinder.    See Howell v. Polk, 532 F.3d 1025 (9th Cir. 2008) (reasonableness of the execution of the search warrant was for the jury); Cochrance v. Qattrocchi, 949 F.2d 11, 14 (1st Cir. 1991) ("it is for the jury to determine the reasonableness of a search in a section 1983 action").    This is not something that may be resolved on a motion for summary judgment.

Defendants seek to hide behind their naked claim that they did not know it was illegal.    They offer nothing from the record.    Instead, it is clear that reaching into someone else's purse is an illegal intrusion.

Defendants' attempt to invoke an advice of counsel defense is misplaced.    No counsel was contacted before Simoldoni rifled through Plaintiffs' purse and pulled out what ultimately was determined to be a recorder.    By the time Defendants contacted counsel, the illegal search had already occurred.    A later determination by counsel cannot insulate the earlier transgression.    Moreover, the decision to copy the device had to be determined in light of how it was obtained.    If it was illegally obtained, then the decision to copy it would also be illegal.    Advice of counsel provides no defense.

30

## IV.    **Plaintiff Has A Claim Under NJLAD.**

### A.    **Defendants Are Liable For Aiding And Abetting.**

Aiding and abetting under the LAD does not only consist of helping someone else commit wrongful acts.  Both New Jersey state and federal courts have found that, "in recent years, following state lower courts, courts in this [D]istrict have found that aiding and abetting one's own conduct is a sufficient basis for liability under the NJLAD." Norton v. Praxair Distribution, Inc., Civ. A. No. 17-6897, 2019 WL 1569826, at *9 (D.N.J. Apr. 11, 2019) (quoting Yobe v. Renaissance Elec., Inc., Civ. A. No. 15-3121, 2016 WL 614425 (D.N.J. Feb. 16, 2016)).  In Norton, the court rejected the proposition that there would be no liability against the individual defendant "because Plaintiff cannot establish that [Defendant] Praxair engaged in discriminatory … conduct violative of the [NJ]LAD…."   In Rowan v. Hartford Plaza Ltd., No. A-0107-11T3, 2013 WL 1350095 (App. Div. Apr. 5, 2013), the Appellate Division held that a supervisor "cannot escape individual liability for his own allegedly egregious conduct based on a narrow construction of the 'aiding and abetting' provision."

Plaintiff here could not establish that the employer – the state judiciary – is liable because, by virtue of the Eleventh Amendment, they cannot be a party.  In Uwalaka v. State of New Jersey, No. Civ. 04-2973 (SRC), 2005 WL 3077685 (D.N.J. Nov. 15, 2005), the defendants argued that the individual defendants cannot

be held liable for aiding and abetting because the State is immune from liability. The court rejected this argument.

> As the Supreme Court noted in <u>Dennis v. Sparks</u>, the fact that one party may be immune from liability does not necessarily extend immunity to their co-conspirators or, in this case, to those accused of aiding and abetting the immune party. <u>Dennis v. Sparks</u>, 449 U.S. 24, 26 … (1980). In <u>Sparks</u>, the Court affirmed the reversal of a District Court ruling which held that because judges could claim judicial immunity, others accused with conspiring with that judge could not be held liable under § 1983, since that "'did not conspire with any person against whom a valid § 1983 suit can be stated.

<u>Uwalaka</u>, 2005 WL 3077685, at *3. The Supreme Court found "no good reason in law, logic, or policy for conferring immunity on private persons" who acted in conjunction with an immune party. <u>Id</u>. (citing <u>Dennis</u>, at 27). Thus, the <u>Uwalaka</u> court "similarly finds that there is no reason to extend the sovereign immunity of the State to private parties accused of aiding and abetting a State employer in violation of NJLAD statutes." <u>Id</u>.

Even assuming that it had a defense, it has waived it by not raising it in their Affirmative Defenses. They did not plead Eleventh Amendment immunity or that they cannot be liable based on the failure to name a responsible party.

## B.  Defendants Are Liable Under The NJLAD For The Reasons Set Forth Above.

Defendants claim they are not liable under the NJLAD for the same reasons set forth in their argument on the equal protection (§ 1983 and NJCRA) claims. As

set forth above, Plaintiff has successfully established her right to proceed on those claims.

## **CONCLUSION**

For the reasons set forth above, Plaintiff respectfully requests that this Court deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

Kang Haggerty LLC
Attorneys for Plaintiff

Dated:  July  2,  2025

*/s/ Ralph P. Ferrara*
Ralph P. Ferrara

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of July 2025, I caused a true and correct copy of the foregoing response, opposition to statement of material facts and declaration of Ralph P. Ferrara, Esquire to be served on all counsel of record via the Courts ECF.

*/s/ Ralph P. Ferrara*_____
Ralph P. Ferrara, Esquire